ALEXANDER F. ROBERTSON et al., as Trustees under the Will of JOHN T. FARISH, Deceased, Plaintiff, v. MARTHA G. DE BRULATOUR, Individually, Respondent and Appellant, and THOMAS H. SOMERVILLE et al., Appellants and Respondents.

1. TRUST—DIVIDENDS, CASH OR STOCK, REPRESENTING PROFITS AND NOT CAPITAL, GO TO LIFE BENEFICIARY. Where a testamentary trust of specific securities is created, with a direction that "the income and profits thereof" be paid to a beneficiary for life, with a bequest over of such securities at the termination of the life estate, extraordinary distributions or dividends, representing accumulated income and profits and not capital, go to the life tenant; and in determining this question the terms used by the corporation in declaring the distribution, as in this case from its "cash surplus," or its methods of bookkeeping are not conclusive; if an examination of the facts establishes that the amount distributed does not intrench upon the capital, but was from a surplus of corporate earnings and income, unaffected by proceeds of sales of real estate forming a part of the company's capital, the life tenant is entitled thereto.

2. STOCKHOLDERS HAVE NO RIGHT TO PROFITS UNTIL DECLARATION OF DIVIDEND. The earnings of a corporation remain its property until a division is made or a dividend declared. Until that time whatever interest a stockholder has therein passes with a transfer of his stock as an incident thereto. Where, therefore, such stock becomes a part of the *corpus* of the trust, dividends thereafter declared are like all other income of the trust fund and belong to the life tenant. Various transactions in testator's lifetime, claimed to have created obligations of the corporation to stockholders, examined, and *held* that such obligations were not created until the distribution of stock and cash was actually declared.

3. PROCEEDS OF SUBSCRIPTION RIGHTS ATTACHED TO TRUST SECURITIES GO TO REMAINDERMEN. New shares of stock purchased by the trustees in the exercise of the right attached to the trust securities to subscribe therefor, and sums of money received from the sale of such subscription rights, become capital and the life tenant is not entitled thereto.

4. WHEN TRUSTEES NOT OBLIGED TO MAINTAIN SINKING FUND. The rule that trustees must maintain a sinking fund, with which to make good any depreciation in the value of the securities by the falling off in premiums, has no application where such securities have been specifically bequeathed.

5. TRUSTEES' COMMISSIONS — CODE CIV. PRO. § 3320. Trustees are entitled to commissions for receiving and paying out all sums of principal, including the value of the securities forming a part of the *corpus.*

6. BENEFICIARY MAY ACT AS TRUSTEE   The life beneficiary may act as trustee with others in the management of the trust, and is entitled to the same commissions as her co-trustees upon the *corpus* of the trust.

*Robertson* v. *de Brulatour,* 111 App. Div. 882, affirmed.

(Argued March 7, 1907; decided April 16, 1907.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered May 28, 1906, which modified and affirmed as modified a judgment entered upon the report of a referee in an action for an accounting.

The facts, so far as material, are stated in the opinion.

*George F. Canfield* and *Kenneth K. MacKenzie* for Thomas H. Somerville et al., appellants and respondents. Money obtained from the sale of real estate by a corporation previously used by the company for its business purposes, when distributed by the company, represents a distribution of *corpus,* and does not go to a life tenant of a trust holding stock of the company. (*Matter of Rogers,* 161 N. Y. 108; *Chester* v. *B. C. Mfg. Co.,* 70 App. Div. 443; *Riggs* v. *Cragg,* 26 Hun, 89; *Matter of Kernochan,* 104 N. Y. 618; *Matter of Curtis,* 29 N. Y. S. R. 217; *Hitte* v. *Hitte,* 93 Ky. 257; *Vinton's Appeal,* 99 Penn. St. 434; *Heard* v. *Eldredge,* 109 Mass. 258; *Gifford* v. *Thompson,* 115 Mass. 478; *Wheeler* v. *Perry,* 18 N. H. 307.) The fact that after the distribution of the $2,500,000 the assets of the New York and Harlem railroad were more than equal to the par value of its outstanding stocks and bonds is not material in determining whether this distribution is capital or income. (*Matter of Rogers,* 161 N. Y. 108; *Chester* v. *B. C. Co.,* 70 App. Div. 443; *Stewart*

v. *Phelps*, 71 App. Div. 91; 173 N. Y. 621; *Hitte* v. *Hitte*, 93 Ky. 257.) Section 3320 of the Code does not authorize the payment of commissions to trustees on anything but money. (Code Civ. Pro. §§ 2730, 2802; *Chisholm* v. *Hamersley*, 114 App. Div. 565.) Mrs. de Brulatour being the sole beneficiary of the trust, is not entitled to act as trustee, and, therefore, is not entitled to commissions. (*Bundy* v. *Bundy*, 38 N. Y. 420; *Rogers* v. *Rogers*, 111 N. Y. 228; *Woodward* v. *James*, 115 N. Y. 346; *Greene* v. *Greene*, 125 N. Y. 506; *Woodbridge* v. *Bockes*, 170 N. Y. 596; *Matter of Shipman*, 53 Hun, 511; *Postly* v. *Cheyne*, 4 Dem. 492; *Matter of Hitchins*, 39 Misc. Rep. 767; *Hoffman House* v. *Foote*, 172 N. Y. 348; *People ex rel.* v. *Donohue*, 70 Hun, 317.) A person beneficially interested in a trust is not allowed commissions for acting as trustee of such trust. (*Blunt* v. *Syms*, 40 Hun, 566; *White* v. *Rankin*, 18 App. Div. 293; *Kahn* v. *Lichtenstein*, 28 App. Div. 211; *Matter of Hitchins*, 39 Misc. Rep. 767; *Miles* v. *Bacon*, 4 J. J. Marsh. [Ky.] 457; *Reiffs' Appeal*, 124 Penn. St. 145; *P. S. Co.* v. *Yandes*, 139 Ind. 307; *White* v. *Rankin*, 18 App. Div. 293; *Imboden* v. *Hunter*, 23 Ark. 622.)

*Henry de Forest Baldwin* and *Herbert C. Lakin* for Martha G. de Brulatour, respondent and appellant. The intention of the testator was that his widow should receive all the income and profits of every description from the trust. (*Matter of Rogers*, 22 App. Div. 428; *Matter of James*, 146 N. Y. 78.) The sum of $31,250, received by the trustees upon the distribution of surplus by the New York and Harlem Railroad Company, is income, and should be paid to the life tenant. (*Matter of Kernochan*, 104 N. Y. 618; *McLouth* v. *Hunt*, 154 N. Y. 179; *Matter of Rogers*, 161 N. Y. 108; *Lowry* v. *F. L. & T. Co.*, 172 N. Y. 137; *Chester* v. *B. C. Mfg. Co.*, 70 App. Div. 443; 183 N. Y. 425; *Stewart* v. *Phelps*, 71 App. Div. 91; *Hemenway* v. *Hemenway*, 181 Mass. 406; *Matter of Stevens*, 46 Misc. Rep. 623.) The trustees are entitled to one-half commissions for receiving the

entire capital of the trust estate. (*Johnson* v. *Lawrence*, 95 N. Y. 154; *Matter of Garth*, 10 App. Div. 100; *Matter of Fisher*, 93 App. Div. 186; *Matter of Whipple*, 81 App. Div. 589; *Schenck* v. *Dart*, 22 N. Y. 420.) Madame de Brulatour is entitled to act as trustee. (*Amory* v. *Lord*, 9 N. Y. 403; *Rogers* v. *Rogers*, 111 N. Y. 228; *Bull* v. *Odell*, 19 App. Div. 605.)

*Edward T. McLaughlin* for Glassel Stringfellow et al., appellants and respondents.

Gray, J. The plaintiffs, as trustees under the will of John T. Farish, who died in 1891, brought this action for an accounting and to have determined thereby questions, which have arisen upon conflicting claims of the *cestui que trust* and of the remaindermen to moneys and securities distributed by corporations, whose stocks formed part of the capital of the trust fund, and questions relating to the trustees' right to commissions upon the *corpus* of the trust and to their management thereof. The sixth clause of the will provides for the trust in the following language:

" *Sixth :* I give and bequeath to Charles M. Fry, Alexander F. Robertson and my wife Martha G. Farish, and the survivors and the survivor of them and to the successor or successors of such survivor Twenty-five hundred (2,500) shares of the capital stock of the New York and Harlem Railroad Company, One thousand (1,000) shares of the capital stock of the New York Central and Hudson River Railroad Company (consolidated), and One thousand (1,000) shares of the capital stock of the Chicago, Rock Island and Pacific Railway Company, also Twenty thousand dollars ($20,000) at the par value of the consolidated bonds of the Erie and Pittsburg Railroad Company, Fifty thousand dollars ($50,000) at the par value of the consolidated bonds of the Chicago and Northwestern Railway Company and Thirty thousand dollars ($30,000) at the par value of the first mortgage bonds of the Louisiana and Missouri River Railroad Company together with all interest accrued on said above described bonds at the time of my death and all

1907.]   Robertson *v.* de Brulatour.   305

N. Y. Rep.]   Opinion of the Court, per Gray, J.

interest accruing thereon thereafter and also every and all dividends which may be declared on the above described stocks subsequent to my death, in trust, nevertheless, to receive the income and profits thereof and apply the same to the use of my said wife Martha G. Farish, during the term of her natural life. * * * [Here follows a power to sell and to reinvest.]

" Upon the death of my said wife I give and bequeath all of the above mentioned shares of stock and bonds, or the proceeds of such as shall have been previously sold, to such persons as would have inherited the same under the laws of the State of New York, if the same were real estate and I had died intestate and unmarried, at the same time as my wife, and in such proportions as they would have inherited the same respectively."

The testator left no children, or descendants, and his residuary estate was given to his heirs-at-law. The testator's widow remarried and is now Madame de Brulatour. She and Mr. Robertson are the survivors of the three trustees named. There has been no difficulty in the past upon their accountings and that which now arises presents legal questions of interest and of importance ; especially, with respect to the proper disposition by the trustees of distributions, or dividends, made by certain corporations upon their capital stock. The right to them, as between the beneficiary of the trust and the remaindermen, will depend, primarily, upon the testator's intention, as it may be gathered from the will, and, then, if that is deemed to be expressed ambiguously or indefinitely, upon the subject, resort must be had to the facts, in order to discover whether the particular dividend was a distribution by the corporation of accumulated earnings and profits, or of that which was capital. There can be no doubt but that the testator has employed rather unusual language in making the trust provision for his wife and, in my opinion, it is such as, by a fair and reasonable reading, would give to his widow, as the beneficiary, everything which is distributed to the trustees, as the legal holders, upon the shares of stock

20

included in the trust; irrespective of all consideration of the origin of that which is distributed.

But, while I entertain the opinion that the trust clause of this will is comprehensive enough to include the extraordinary dividends, or distributions, in question, however they may be termed, which were made by the New York & Harlem Railroad Company and by the Chicago, Rock Island and Pacific Railroad Company, I prefer to place our decision, in that respect, upon the ground that their distributions were of income and profits, and not of capital.

The New York & Harlem Railroad Company's distribution was made in September, 1899, pursuant to a resolution of the board of directors. It read:

" Whereas it appears from the treasurer's report that the company's cash surplus now amounts to upwards of $2,500,000 over and above all claims and obligations existing and contingent, and that the same is now available for distribution among the stockholders; It is Further Resolved that the sum of $2,500,000 of the said surplus be distributed at the rate of $12.50 per share to all stockholders of record at close of business on the 23rd day of September, 1899, and that the treasurer be and he is hereby authorized and directed to make such payment on the 2nd day of October next." The word dividend is not used; but that is quite immaterial, if the facts disclose the origin of this " surplus " and enable us to ascertain that " income and profits " were the subject of distribution. The findings are explicit enough upon this head. At the time that the resolution was passed, the company's books showed on the credit side of the profit and loss account a surplus of $3,096,705.84. The contention of the remaindermen was, in effect, and the referee so held below, that the $2,500,000 distributed by the directors represented the proceeds of sales of portions of the company's real estate; which, by reason of certain leases of its railways, more particularly referred to hereafter, had become useless. Being the proceeds of the sale of a " portion of the abandoned plant of the company, theretofore used in its business," as they say, the

distribution was of the *corpus* of the company's property and was a return of capital. The facts do not justify the contention and it is based on a fallacy, in the assumption that, because the sale of real estate had put the company in the possession of sufficient cash, the distribution, necessarily, was of the real estate as converted. But that is not the fact. The surplus item in the profit and loss account did not arise from, nor had it any relation to, these sales. The result of the sales was to increase the cash balance and, undoubtedly, the cash proceeds were used in the distribution of the company's surplus among the stockholders, as was the finding of the referee; but that was a mere matter of bookkeeping, as will be explained later. The essential is that the sales did not create the surplus, nor affect it as an item in the account of assets and liabilities, and such are the findings. The surplus shown by the company's ledger represented the difference between assets and liabilities, as carried in the profit and loss account, and how it arose is readily ascertainable from the accounts of the company's transactions. In 1873, the company leased its steam lines and real estate appurtenant thereto to the New York Central & Hudson River Railroad Company for 401 years, at a rental measured by payments of eight per cent on its capital stock and of the interest on its bonds. In 1896, it leased its horse-car line on Fourth and Madison avenues to the Metropolitan Street Railway Company for 999 years, at a rental measured by payments on the former's capital stock, which would amount, in a few years, to four per cent. As the result of these leases, the company, while still a going concern, ceased to operate its railways. It owned, in addition to the great terminal station at 42nd street, other, and unneeded, parcels of real estate; which had been formerly used, either, for a station, when the terminal had been below 42nd street, or for its street-car stables and other similar corporate purposes. Some of these properties had not been included in the leases. One of them was the block, between Fourth and Madison avenues, 26th and 27th streets, now occupied by the "Madison Square Garden," and which had been the principal

railroad station before the building of the "Grand Central" depot; another was an unimproved block between Fourth and Lexington avenues, 34th and 33rd streets; another was the block at Fourth avenue and 32d street, used for street-car stables, and another was a plot at Madison avenue and 85th street, also, used for the same purposes. Between 1886 and 1899 these four properties were sold at a large profit. In the company's ledger was kept an account known as "Real Estate in New York, City," and, as sales were made, the proceeds were, wholly, credited to that account; with the result, of course, that, to the extent of the credits, the charge to the account was reduced. The profits of the transactions went to reduce the carrying cost upon the books of the other real estate. The moneys were charged to cash in "temporary assets" and the result of the bookkeeping was that the charge against real estate became lessened, until the value, on the books, of the company's New York city real estate was written off at $478,376.81. If the profits upon the transactions of sale had been regarded as creating a surplus of assets, they would not have been credited in the real estate account. In that case, only the cost of the real estate sold would have been credited and the item of surplus would have been increased to the extent of the clear profit; but that item never reflected the profit on sales. The account with the real estate reflected the condition of the company's real estate as an asset and it would seem quite plain that this method of bookkeeping, by which the proceeds of sales of real estate were carried as a credit to the real estate account, actually, increased the value of the capital stock by the amount that the clear value of the real estate in possession was increased.

This is shown by the findings of fact, which must negative any inference that the subject of distribution by the resolution of September, 1899, was the proceeds of the real estate sales. It is found that "the Profit and Loss account on the company's books and the company's surplus account on its books were practically unchanged and unaffected by the

aforesaid sales of real estate.   *   *   *   When the above
mentioned properties were sold, the purchase price thereof
was credited to the 'Real Estate in New York City' account
and charged to cash, but without affecting on the books the
balance of surplus in the Profit and Loss account.   After said
sales the 'Real Estate in New York City' account was carried
at $478,376.81, at which figure it stood in September, 1899.
Said Profit and Loss account included both earnings and
income and not necessarily any profits from the sale of real
estate owned by the Company."

The only surplus, which the books showed to the directors
as held by the company, was its profit and loss account.   That,
as already mentioned, amounted at the time to $3,096,705.84.
In 1873, at the time of the making of the first lease, it
amounted to $1,611,347.63, and we are informed, by the find-
ings, that from that date it did not fall below that figure,
" but increased from year to year up to September 30th, 1899,
when it amounted to $3,096,705.84."   We are, further,
informed how this gradual increase was possible.   Beyond
the rentals from its lessees, the company was in receipt of
" some interest and dividends on investments " and " it has
not required any cash capital for the purpose of carrying on
its business."   Now the total increase in the surplus in the
twenty-six years from 1873 was less than $1,500,000, or at the
rate of only about $57,000, a year.   In view of the finding
that the profit and loss account included the corporate earn-
ings and income and that the surplus item in that account was
unaffected by the real estate sales, but the one conclusion is
permissible, that the surplus, or increase in the surplus, arose
from the excess of the company's revenues, remaining after
the payment of the annual dividends.   That item in the
account would have been just the same, if there had been no
sales; but, to the extent that sales were made of real estate
and of securities, (and there were sales of the latter), assets
were liberated and the cash accumulations created a cash
surplus, which the directors could, in the exercise of their dis-
cretion, distribute among the stockholders.   When that dis-

tribution was made the book accounts were unchanged; except that the profit and loss account then would, and it did, in fact, show the credit item of surplus reduced to $576,754.78. The surplus was never capitalized; but that it was carried in some form of investment is evident. A surplus of earnings and profits would, presumably, in a well-conducted business, be carried by the company in some form profitable to it; until such time as the directors should decide as to its disposition by way of distribution, or otherwise, as the corporate affairs might warrant.

Authorities need not be cited in support of the views which have been expressed. We have, upon several occasions, considered the subject of the respective rights of life tenants and remaindermen to distributions made by corporations among their stockholders of the corporate assets. It would not be profitable, at this time, to review them; inasmuch as in the latest of our decisions the principle has been fully enough discussed for the present purpose. (*Lowry* v. *Farmers' L. & T. Co.*, 172 N. Y. 137.) In *Lowry's* case, the Pullman Palace Car Co. declared a dividend of fifty per cent upon its capital stock, payable in new share certificates at par. The discussion was upon the effect of the corporate action and whether the distribution should be regarded as of earnings, or as an addition to capital. Upon the authority of *McLouth* v. *Hunt*, (154 N. Y. 179), which involved the disposition of a stock dividend, made by the Western Union Telegraph Company, as between the beneficiary of a trust and the remaindermen, we held the question to be one determinable by the facts. In each case, the corporate action was based upon an accumulation of earnings and the dividend declared was adjudged to be income and not capital. In both of the cases, it is true, the resolutions of the directors of the companies recited, in effect, that the dividend was from earnings, which had been withheld from the stockholders, or which had accumulated as a surplus " at the credit of income account." The rule, however, was laid down, in *Lowry's* case, that the determination of such a question, when presented, must be reached, *first*, by

a consideration of the comprehensiveness of the language in which the gift is made to the beneficiary and, *secondly*, by an investigation of the facts underlying the transaction through which the corporate property is being. distributed; for the statement of the directors, in taking the corporate action, is not, necessarily, conclusive. It was, also, determined that though the stockholders own, proportionately to their holdings, the right to share in the corporate assets, they belong to the corporation, until the corporate agents exercise their discretion and divide them among the stockholders. When such an appropriation of the assets is made, those who are the recorded holders of the stock at the time of the distribution are the persons entitled to receive it from the company. So in that case, where the rents, issues and profits of the trust estate were to be applied to the use of the beneficiary, it was held that the stock dividend was comprehended within the term "profits." A portion of the opinion may be quoted, as having some pertinency to the present case. It was said that "a fund had been created by an accumulation of the net earnings of the corporation and it remained a part of the general assets, until, in the judgment of the directors, the time came when it was proper and prudent to distribute it among the stockholders. That which the directors of the corporation distribute among its stockholders, without intrenchment upon capital, must be comprehended within the term 'profits,' and we should assume that the testator intended that what might be paid in that way should belong to the beneficiary. * * * It was, simply, a mode of distributing the profits earned by the employment of the capital."

The *Rogers* case, (*Matter of Rogers,* 161 N. Y. 108), is not an authority, particularly, in point; because, there, the industrial corporation, whose shares of stock were held in trust, sold its plant to a new corporation for a certain amount of its stock and went out of business. In liquidating its affairs, there remained property on hand which had accumulated in the past as a surplus and consisted in government bonds, railroad stocks, real estate, etc. These were sold and

converted into cash, and they amounted to nearly half the entire value of the corporate assets. The proceeds of the sale of these investments, which the company had held during many years of its business life, were held to be income and payable to the beneficiaries of the trusts. In that respect the case has, indeed, some bearing upon the present question. In the present case, had the directors worded their resolution, so as to read that a dividend of $12.50 per share was declared from the company's surplus assets, I doubt if there could be much hesitation upon this question. If, in declaring a distribution of the "company's cash surplus," they created a doubt as to the subject, investigation resolves it and shows that it was a distribution of a surplus long accumulating from earnings, profits and income, which had been a part of the general assets, but was always the representative of income and not of capital. I think it needless to prolong the discussion upon this question. Sufficient has been said, in connection with the opinion of the Appellate Division, which overruled the referee upon this point, to justify the conclusion that the distribution in question was comprehended within the testator's gift to his beneficiary of the "income and profits" of the trust properties.

The disposition to be made by the trustees of the 100 shares of stock received from the Chicago, Rock Island & Pacific Railroad Company, in 1898, and of certain cash dividends, paid in subsequent years, was correctly adjudged below. The referee held that they went to the beneficiary of the trust as income, and he has been sustained by the Appellate Division. The question is one of much less difficulty than that presented in the case of the New York & Harlem Railroad Company's distribution of surplus and, as it has been carefully and well discussed in its legal aspects by the referee, it needs but slight mention here. In 1881, 1882, 1883 and 1884 the company's board of directors, by resolutions, directed the transfer from "the Profit and Loss, or Income, Account" of sums of money, aggregating $7,000,000, to the credit of a new account, to be known as the "Addition and Improve-

ment Account," " which shall be reimbursed to the Income Account from the proceeds of sales of bonds and stocks as shall be hereafter directed." On the dates of the passage of these four resolutions, further resolutions were adopted, which authorized the execution of bonds by the company to its treasurer, as trustee, obligating it for the re-payment to him of the amounts that were transferred from the income account, within ten years, in cash, or in shares of capital stock. Each bond, further, provided that *when it was paid*, the proceeds " shall be distributed to those who shall at the time be stockholders," proportionately to their share holdings. In 1898, resolutions were adopted, by which " all the reserved shares of the authorized capital stock of the Company " were issued to the treasurer, in payment of all the moneys due upon the bonds, except as to $2,384,400 thereof, which shares the trustee was directed to distribute to the stockholders of record. They provided for the payment of the unpaid balance due on the bonds by directing the payment of special cash dividends to the trustee, quarterly, in each year; which he was to distribute among the stockholders. Through this corporate action, these plaintiffs, as trustees, received the 100 shares of stock and the cash dividends, in question. The remaindermen claim, in effect, that, as these obligations of the company were created in the testator's lifetime, this distribution of stock and dividends after his death should be treated as capital. The claim is untenable. The transaction was, clearly, a method of bookkeeping adopted by the company, by which the moneys to the credit of income account in its ledger could be transferred to the new account, to represent the expenditures in the improvement of the company's properties, and, at the same time, the company could be made to appear as a temporary borrower of the same and, therefore, a debtor to income account. This arrangement was, formally, expressed in the bond to its treasurer, as trustee. The funds themselves remained, as much as ever, the property of the company and they never lost their character as earnings, or income. There was no actual appropriation of them to the stockholders, until the resolu-

tions of 1898, which provided for the payment of the bonds given to the treasurer and for the distribution by him among the stockholders of the shares and moneys in which payment was provided to be made. The bonds constituted no appropriation of the moneys to the then stockholders and the persons, who would answer that description and be entitled to share upon distribution, could not be ascertained, until the time when the bonds were paid off to, and a distribution ordered to be made by, the treasurer. The moneys were never set apart for the stockholders; nor was any indebtedness created to them, until the dates when, under the resolutions of the directors, in 1898, the stock, or the cash, became payable. (*Beveridge* v. *N. Y. Elev. R. R. Co.*, 112 N. Y. 1, 27.) The distinction between this case and *Brundage* v. *Brundage* (60 N. Y. 544), is plain and substantial, and is well pointed out by the referee. In that case, each stockholder received the certificate of the New York Central & Hudson River Railroad Company declaring that he was entitled to a sum specified; which certificate carried dividends and was transferable on the books. The resolution, under which the certificates were issued, recited an application of earnings to construction and other purposes, and that the stockholders were entitled to evidence, and to reimbursement, of such expenditure, and, then, provided for the issuance of the certificates; of which the testator, in that case, as a stockholder, received his proportionate number. Both resolution and certificates evidenced a present indebtedness and it was held that the certificates passed as a part of the testator's residuary estate. In the present case, the obligation of the company, as expressed in its bonds to the treasurer, as trustee, was for the benefit of those stockholders only, who should be such at the time "when the bond is paid." It conferred no right upon existing stockholders. It was no more than an incident to the testator's ownership of stock and, being such, passed to these trustees, who became the owners of record. A consideration of the opinions in *Boardman* v. *L. S. & M. S. Ry. Co.*, (84 N. Y. 157), and in *Jermain* v. *Same Co.*, (91 ib. 483), will

make the rule in such cases clear, by which the rights of stock-holders are to be governed with respect to an appropriation of net earnings to the payment of dividends. It was held that a dividend belongs to the person who is the holder of the stock at the time it is declared. The assets remain, at all times, the property of the corporation " until a division is made or a dividend is declared," and, until that time, what contractual right to a dividend the stockholder may be deemed to possess would pass with an assignment, or transfer, of the stock, as an incident thereto. As the referee, very correctly, decided " the stock, to which, as an incident, the right to the proceeds of the bonds attached, had    *    *    *    become vested in the trustees    *    *    *    and, as a consequence, the dividends from the proceeds,    *    *    *    became payable to the trustees and are to be regarded, like all other income of the trust fund, as the absolute property of the life tenant."

The questions as to the new shares of stock purchased by the trustees, in the exercise of their right to subscribe there-for, and as to the sums of money received by them from sales of subscription rights upon the stocks given by the will in creation of the trust, were correctly decided in favor of the remaindermen.

So, also, was the question correctly decided, which the remaindermen raised as to the obligation upon the trustees to maintain a sinking fund, with which to make good any depreciation in the value of the securities by the falling off in the premiums. This rule has no application where the securities have been specifically bequeathed. It, only, applies, in ordinary cases and where the will affords no aid upon the subject of the testator's intention, when trustees have, themselves, made investments from the trust funds, in the purchase of securities at a premium. (*N. Y. Life Ins. & Trust Co.* v. *Baker*, 165 N. Y. 484, affirming the decision in 38 App. Div. 417 )

A question was raised as to the right of the trustees to the statutory commissions on the entire capital of the trust received by them. The plaintiffs had accounted, as executors of the

estate, in 1893, and, pursuant to the decree upon their account-ing, had turned over to themselves, as the trustees appointed by the will, the securities which constituted the trust fund for the testator's widow. At that moment they assumed a new office, with distinct duties and responsibilities. Upon the present accounting, as trustees, the statute provision as to commissions was contained in section 3320 of the Code of Civil Procedure, as amended in 1904, and that gave to " trustees of an express trust   *   *   *   as compensation for services   *   *   *   commissions, as follows: for receiving and paying out all sums of principal," five per cent on the first $1,000, two and one-half per cent on the next $10,000, and one per cent on the balance. Commissions were given, at the like rates, for receiving and paying out income in each year. Before this amendment of the statute, a trustee was allowed commissions upon the same rule that was applied in the case of an executor, or administrator. (See Code of Civil Procedure, sections 2730, 2802, 2811.) That rule, however, fixed the commissions upon the receiving and the paying out of " *all sums of money* " and, as it was applied, trustees would not be allowed commissions upon specific securities bequeathed in trust and received, in advance of their conver-sion into money, or except in a case where the securities have been turned over to the parties entitled, as cash. (*McAlpine* v. *Potter*, 126 N. Y. 285; *Phœnix* v. *Livingston*, 101 ib. 451.) When the Legislature amended section 3320, by adding the present special provision for the compensation of trustees, its amendment must be considered to have been enacted in view of what the statute already provided, as construed by the courts. The amendment established a new and different rule governing their compensation; leaving section 2730 unchanged and to govern as to executors and administrators. A trustee became, then, entitled to commissions " for receiv-ing and paying out all sums of *principal*" and " for receiving and paying out *income* in each year." They were to be no longer fixed by analogy to the rule in the case of an executor and based upon " all sums of *money* " received and paid out.

The change of phraseology was too deliberate to be disregarded and something different from the existing rule must have been intended. If this were not so, a mere change in the sections relating to executors and administrators, so as to make them applicable to trustees, would have sufficed. As a provision for a more liberal measure of compensation, it, certainly, is most reasonable, in view of the responsibility devolved upon the trustee for the preservation of the trust estate. Usually, as in the case of this will, trustees have a discretionary power of sale and they have to decide as to the continuance of the trust in the securities received, or whether there shall be sales and reinvestment of the same. Their interest in commissions should not be allowed to affect their judgment. Evidently, the legislature, recognizing the ambiguity in the Code provisions with reference to trustees, intended to establish by the amendment, somewhat inartificially expressed, a rule, which, as I construe it, gives to trustees the right to commissions, in such a case, upon the value of the securities, both for receiving them and for paying them over. The value of the securities in this trust was ascertained and I think that the Appellate Division correctly held, overruling the referee, that these plaintiffs, as trustees, were entitled to one-half commissions for receiving the entire capital of the trust estate.

As to the right of the testator's widow, the beneficiary of his trust, to act as trustee, the referee held, and the Appellate Division has affirmed his decision, that she could do so. I think that the decision was correct. If she were the sole trustee, the question might be different, (see *Woodward* v. *James*, 115 N. Y. 346, 357, and *Greene* v. *Greene*, 125 ib. 506); but she is, certainly, competent to act as trustee with others, in the management of the trust; if not as to her own interests, so far, at least, as it has to do with the preservation of the fund for the remaindermen. (*Rogers* v. *Rogers*, 111 N. Y. 228.) She was selected by the testator as one of the trustees to preserve the estate and the legal title vested in all of them. She had duties to perform as a trustee, aside from what concerned

herself, and they were for the benefit of the remaindermen, and there is no reason why she should not receive the same commissions as her co-trustee upon the *corpus* of the trust. The statute, (Code of Civil Procedure, sec. 3320), makes no distinction and gives to two, or more, trustees of an express trust the compensation therein specified.

No other questions demand our consideration. Those discussed have been well and carefully dealt with below and their review here is justified by their importance, or by their novelty. The conclusion reached is that the judgment entered upon the order of the Appellate Division, and now appealed from, was correct and should be affirmed. Some of the questions presented by the appeal have not been free from difficulty and they have been very carefully and ably argued in behalf of the trustees and the remaindermen. I advise that costs be allowed to both and, that the burden may be equitably borne, that they should be paid out of the capital of the trust estate.

Cullen, Ch. J., Edward T. Bartlett, Haight and Willard Bartlett, JJ., concur; Hiscock and Chase, JJ., concur in result.

Judgment affirmed.