In the Matter of the Judicial Settlement of the Account of EDWARD C. SCHAEFER and GEORGE G. SCHAEFER, as Surviving Executors of and Trustees under the Last Will and Testament of FREDERICK SCHAEFER, Deceased.

ALBERT SCHAEFER, Appellant, Respondent; EDWARD C. SCHAEFER and GEORGE G. SCHAEFER, as Trustees, Respondents, Appellants.

First Department, May 4, 1917.

Trust — apportionment of dividends on stock held by trustees between beneficiary and corpus — increase of value in corporate stock through accumulations of profits made by corporation — sale of stock by trustees to corporation itself — partial liquidation of corporate affairs — when life beneficiary entitled to apportionment of increased value of stock sold — trustees — commissions — effect of annual receipt of commissions — waiver.

Ordinary cash dividends belong to the life tenant or beneficiary of an estate.

Extraordinary dividends representing accumulated profits, whether distributed in cash or in the form of stock, are to be apportioned between the

First Department, May, 1917.    [Vol. 178.

corpus of the trust and the income, in the proportion in which the surplus thus distributed has been earned before or after the creation of the trust fund. This apportionment is made in order to preserve the integrity of the trust fund and at the same time conserve the rights of the life beneficiary.

When a corporation is liquidated, its assets sold, and the proceeds distributed among its stockholders, an apportionment must be made between the capital of the trust fund and the income, and so much of the sum received by the trustee as represents profits accumulated since the creation of the trust must be attributed to income and paid to the life tenant; otherwise, there would result an increase in the corpus of the fund by accumulations of income, which, except for the benefit of infants, is against public policy and expressly condemned by statute.

Where trustees who are also remaindermen hold one-half of the stock of a domestic business corporation and sell the same to the corporation itself at a time when the value thereof has more than doubled since the creation of the trust, owing to the fact that the corporation retained portions of its profits instead of paying them out by way of dividends, thus enhancing the corporate assets and the value of the stock, there has been in effect a partial liquidation of the corporation and the sum received by the trustees should be apportioned between the capital of the trust fund and the beneficiary under the aforesaid rule which obtains when a corporation is liquidated.

The apportionment should be made in so far as the price received by the trustees on the sale of the stock to the corporation represents accumulated unrestricted profits earned since the creation of the trust. But any increase in the value of the stock not caused by the expenditure upon it of a part of the accumulated profits and any increase in the value of the good will are the legitimate and proper accretions of the corpus of the trust fund and in so far as represented by the price received from the sale of the stock should be accredited by the trustees to capital.

Where the trustees deducted commissions on annual settlements of their accounts they are deemed to have waived any commissions to which they might be entitled in excess of the amount retained by them.

SHEARN and DAVIS, JJ., dissented, with opinion.

CROSS-APPEALS by Albert Schaefer and by Edward C. Schaefer and George G. Schaefer, as trustees, from a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 2d day of June, 1916, settling the accounts herein upon the report of a referee.

*Conrad Saxe Keyes* of counsel [*Axel Josephsson*, attorney], for the appellant, respondent.

*Ashbel P. Fitch*, for the respondents, appellants.

SCOTT, J.:

The interesting and important question presented for our consideration is that raised by the appeal of the objector, Albert Schaefer.

Frederick Schaefer, the testator, died in May, 1897, leaving a last will and testament and a codicil thereto, all of which were duly admitted to probate. By the terms of the will his executors, the present accountants, were directed to divide the estate into a number of shares, one of which was to be held in trust for the benefit of Albert Schaefer during his life, the remainder, in case he died without children, going to the two accountants and two other children of the testator.

One of the principal assets of the estate consisted of 2,499 shares of the capital stock of the F. & M. Schaefer Brewing Company, a corporation organized with a capital stock of $650,000, represented by 6,500 shares. At the time of the testator's death one-half of the stock of the brewing company was held by him and the members of his family. The testator's stock was held by the accountants as executors until 1902, when it was distributed among the parties in interest, 500 shares being allotted to the trust required to be set up for Albert Schaefer. These shares were held by the accountants as trustees of said trust until September, 1912, when they were sold, together with all the other stock held by the trustees, for the benefit of other beneficiaries under the will or owned individually by the trustees and others, the total number of shares sold being 3,250, or one-half of the capital stock. The purchaser was the brewing company itself, and the agreed price was paid in cash or its equivalent. During the time the accountants held the stock as trustees Albert Schaefer received his proportionate share of all the dividends declared and paid by the brewing company.

The stock was carried by the trustees at a valuation of $200 per share. It was sold for $415 per share. These prices may be assumed to represent with accuracy the respective values of the stock at the time the trust fund was established, and at the time the stock was sold. The trustees were respectively president and treasurer of the company and necessarily cognizant of the value of its assets and consequently of its capital stock.

It is conceded that during the years that the trustees held this stock the company did not distribute all of its profits by way of dividends, but prudently retained each year a portion of the net earnings or profits as a surplus. These profits thus retained went to the enhancement of the assets, and it is to the retention and investment of this surplus that at least some of the increased value of the stock is to be attributed. The trustees have credited to the capital of the trust the whole proceeds of the 500 shares of stock which they held for the benefit of Albert Schaefer. He claims that he is entitled to be paid so much of that sum as represents the income and profits earned, but not distributed by way of dividends.

This presents in a somewhat new phase the question, much discussed in recent years, as to the distribution of the profits of corporations between life tenants and remaindermen, but although that question does not appear to have heretofore arisen under precisely the same circumstances as are here present, I am of the opinion that the principles which have been enunciated by our courts of highest authority afford a sure guide to the determination of the present question.

The whole subject was discussed with much thoroughness by Judge CHASE in *Matter of Osborne* (209 N. Y. 450), in an opinion in which he traced the development of the law upon the subject, citing many cases in England and in this State. The consensus of all the decisions upon the general subject is:

*First.* That ordinary cash dividends belong to the life tenant or beneficiary of the estate.

*Second.* That extraordinary dividends representing accumulated profits, whether distributed in cash or in the form of stock, are to be apportioned between the corpus of the trust and the income, in the proportion in which the surplus thus distributed has been earned before or after the creation of the trust fund. This apportionment is made in order to preserve the integrity of the trust fund and at the same time conserve the rights of the life beneficiary. (*Matter of Osborne, supra,* 477.)

*Third.* When a corporation is liquidated, its assets sold, and the proceeds distributed among its stockholders, an apportionment must be made between the capital of the trust fund and the income, and so much of the sum received by the trustee as

represents profits accumulated since the creation of the trust must be attributed to income and paid to the life tenant; otherwise, there would result an increase in the corpus of the fund by accumulations of income, which, except for the benefit of infants, is against public policy and expressly condemned by statute. (*Matter of Rogers*, 22 App. Div. 428, 436.)

These general rules are not questioned by the trustees, but they say that they are inapplicable here because there had been no payment by way of dividend and no liquidation of the company, which still remains a going concern. This does not, in my opinion, answer the life tenant's claim. It is true that there has been no general liquidation of the company, but there has been a liquidation so far as concerns one-half of its capital stock. The company has bought and holds in its treasury one-half of its capital stock, thus reducing by one-half its outstanding share capital. For that stock it has paid, in cash or its equivalent, what we may assume to represent the value of one-half of its assets. What it may do with that stock hereafter is no concern of the trustees or of their *cestui que trust*. The trustees have at least liquidated, that is to say, have turned into money, their interest in the company which was formerly represented by shares of stock. What does this money in their hands represent? Concededly it represents in part accumulated profits earned during the lifetime of the trust, for the stock they sold represented and stood for one-half of the assets of the company, and those assets in part represented accumulated profits. The reason for the rule which requires, in case of a complete liquidation of a corporation, that an apportionment be made between capital and income, seems to me inevitably to require that a like apportionment be made in the present case. Otherwise, as pointed out by CULLEN, J., in *Matter of Rogers* (*supra*), the accumulated profits will go to the unlawful increase of the corpus of the estate and the enrichment of the remaindermen at the expense of the life beneficiary. As is said by Thompson on Corporations (2d ed., § 5414) in a section quoted with approval in *Matter of Osborne* (*supra*, 476): "The object of the inquiry in every case should be to do justice to the life tenant and remainderman and at the same time effectuate the intention of the creator of the trust."

Justice to the remainderman and to the life tenant requires that the trust fund shall be kept intact, but not enhanced by adding to it any part of the income, and that the life tenant shall receive all of the income whenever that comes into the hands of the trustee. Where the trust fund consists of corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustee in any form or manner the life tenant is entitled to receive them. So far then as the price received by the trustees on the sale of the stock to the corporation represented accumulated, undistributed profits earned since the creation of the trust, the life tenant is entitled to an apportionment. We need not now consider whether or not the application of this just and reasonable rule in the present case will result in compelling trustees to make nice discriminations and apportionments whenever they sell a stock for more than it cost them. As suggested in *Matter of Rogers (supra)*, the inconvenience and inherent difficulty in so doing may serve to prevent any such extension of the rule. In the present case, however, there will be no inconvenience and should be no difficulty in making a just apportionment. Of course, any increase in the value of the company's property not caused by the expenditure upon it of a part of the accumulated profits, and any increase in the value of the good will are legitimate and proper accretions of the corpus of the trust fund and, so far as represented by the price received from the sale of the stock, are properly to be accredited to capital.

There should be no difficulty in ascertaining from the books of the brewing company just how much of the net earnings in each year has been retained and accumulated. Just how the company invested or used its accumulated profits is immaterial. In one form or another it is represented in the assets, and when the company liquidated the trustees' stock by paying for it in cash, it retained all of the assets representing in part the accumulated, undistributed profits.

Unless the parties are able to agree as to the proper apportionment to be made in accordance with the views herein expressed, a further reference will probably be necessary. On

the other question, raised by the appeal of the trustees, I entirely concur with Mr. Justice SHEARN.

To the extent indicated, the decree should be modified with costs to the objector, appellant, payable out of the corpus of the trust fund, and the matter remitted to the Surrogate's Court to be dealt with in accordance with this opinion.

CLARKE, P. J., and LAUGHLIN, J., concurred; DAVIS and SHEARN, JJ., dissented.

SHEARN, J. (dissenting) :

An important question is involved in the appeal of the life tenant, Albert Schaefer, which arises as follows: Frederick Schaefer, the testator, died in 1897, leaving a will under which a trust was created for Albert Schaefer. One of the principal assets of the estate was 2,499 shares of the capital stock of the F. & M. Schaefer Brewing Company, a corporation capitalized at $650,000, represented by 6,500 shares of capital stock. At the time of the testator's death half the stock of the company was owned by testator and members of his family, and the other half by the testator's brother Maximilian and members of the latter's family. The testator's stock was held by the executors until 1902, when it was distributed among the parties in interest. Upon this division 500 shares of the said stock were allotted to the Albert Schaefer Trust Estate. The trustees held the 500 shares as part of the principal of the trust until September 12, 1912, when they were sold to the corporation at $415 a share plus a ten per cent dividend. The proceeds of the sale, $207,500, but not including the ten per cent dividend, were credited by the trustees in their account to the principal of the trust. Up to the date of the sale both of the trustees, George G. Schaefer and Edward C. Schaefer, were directors of the company, the former being the treasurer and the latter the president. As such directors they were in the minority, being two out of five. They were also minority stockholders holding both individually and as trustees only 2,588 shares. What really happened on September 12, 1912, was that the Maximilian branch of the family, employing the credit of the corporation for the purpose, bought out

the interest in the corporation of the family of Frederick, for on the same day the trustees also sold to *the corporation* 334 shares of stock held by them for the benefit of Frau von Burtenbach, one of the children, together with 1,000 shares owned by Edward C. Schaefer individually, 750 shares owned by George G. Schaefer individually, and the individual holdings of Frau von Burtenbach and another daughter Amelia G. Chatillon. All of these 3,250 shares were bought at $415 each and upon the following terms: $1,000,000 cash (raised by negotiating a mortgage on property of the corporation and borrowing $250,000 from Rudolph J. Schaefer on the note of the corporation), $300,000 by bond and second mortgage of the company, and $48,750 by a note of the corporation to Edward C. Schaefer, who, together with George G. Schaefer and the other individuals who sold their individual stock, took in part payment a second mortgage for $300,000 covering certain real estate belonging to the corporation. The stock so purchased by the company was held *as treasury stock* (not *retired*, as stated in the prevailing opinion) and the business continued without interruption and without sale or liquidation of any of its assets or of said treasury stock. There was an increase in the surplus of the company during the period between the death of Frederick Schaefer and September 12, 1912, the surplus having been increased from $590,000 in 1897 to $1,100,000 in 1912, exclusive of the increase in the value of the real estate of the corporation. In other words, during these fifteen years, $34,000 a year on the average was retained and put into surplus. Considering the magnitude of the corporation's business, this was a very moderate amount to carry into surplus, and there is no suggestion of bad faith in the adoption of this reasonable business policy, prompted by a regard for the corporation's welfare. The entire surplus with the exception of a reasonable cash balance was invested in chattel mortgage loans to customers of the brewery, license loans to customers, buildings, brewery machinery, etc., requisite for the proper conduct of the business, so that it appears that the surplus was actually employed as capital. The objection to the trustees' account made by the life tenant is based upon the contention that at least a portion of this

increase in surplus represents accumulated earnings since the death of the testator which should have been available for distribution to stockholders as extra dividends and should equitably pass to him instead of being accumulated and added to the principal of the estate, his theory being that the transaction in question was analogous either to a liquidation *pro tanto* of the company's business or to the declaration of a stock dividend.

The question is a novel and an important one and no case similar to it has been cited by counsel or is referred to in the leading cases that have elaborately reviewed the development of the principle of apportionment of earnings between life tenant and remaindermen.

In *Matter of Osborne* (209 N. Y. 450) Judge CHASE reviews the development of the law. It appears that the early rule in England was that all extraordinary or unusual dividends declared during the continuation of a life estate whether payable in cash or in stock belonged to the corpus of the fund and not to the income. The rule has been materially modified and dividends of cash are now held to belong to the life tenant and stock dividends to the remaindermen, subject, perhaps, to an examination of the facts and circumstances in each case in applying the rule as stated. In this State the earliest case considering the question was *Clarkson* v. *Clarkson* (18 Barb. [1855] 646), and it was held that the *cestui que trust* was entitled to all dividends of every kind declared upon the stock so far as the same did not intrench upon such capital of the trust fund. In *Riggs* v. *Cragg* (89 N. Y. [1882] 479) the Court of Appeals said that the right to stock dividends as between tenant for life and remainderman has not been considered by the court of last resort in this State and that it would be the duty of the court when occasion arises to seek to settle the question upon principle. In *McLouth* v. *Hunt* (154 N. Y. 179) the court held that no distinction should be made between a stock dividend and a cash dividend on that ground alone. It did not discuss the question as to whether a dividend partly earned before the death of a testator and partly earned after the death of a testator, whether the same was payable in cash or in stock, should be apportioned between

the beneficiaries for years or life, and those entitled to the residue. In *Lowry* v. *Farmers' Loan & Trust Co.* (172 N. Y. 137), which held that the stock dividend belonged to the life beneficiary, the decision might well have proceeded from the intention of the testator as expressed in the will. So in the case of *Robertson* v. *De Brulatour* (188 N. Y. 301). In *Thayer* v. *Burr* (201 N. Y. 155) where part of the distribution represented simply the increased or enhanced market value of the securities held by the company exclusive of earnings, it was held that the life tenant was not entitled to this increase in the value of the corpus of the trust. The decision was intended to be a recognition of the right to an apportionment of the dividend so as to preserve the corpus of the trust estate. It was not based upon the alleged right in the life estateman to all dividends so long as they did not intrench upon the capital of the corporation. In *Matter of Harteau* (204 N. Y. 292) a dividend from the surplus earnings of the Metropolitan Plate Glass Insurance Company was considered and the question was whether the sum received by the executors and trustees for the additional stock purchased with the surplus dividend of the Metropolitan Plate Glass Insurance Company was to be regarded as capital or income. Judge WILLARD BARTLETT said: "The question whether the surplus dividend is to be deemed capital or income depends upon the time of the acquisition of the surplus which was divided." The findings of the surrogate showed that the amount of the dividend was $100,000; that shortly after the testator's death the surplus of the insurance company was $190,000 and at the time of the adoption of the resolution it was $279,000, an increase of $89,000 within that period. This increase was held to be regarded as income and the portion which went to the executors was deemed to be income. Judge CHASE says in *Matter of Osborne*, after reviewing these cases: "It is conceded that the capital of a corporation cannot be divided among the life beneficiaries. It is not alone the *capital of the corporation* that should be preserved, but the *capital of the trust fund* whether invested by the trustees in stocks of corporations at a premium, or acquired from the testator or maker of the trust. The surplus of the corporation existing at the formation of the trust or when the stock is

purchased represents a part of the capital of the estate as fully as does the capital of the corporation. "

Judge CHASE further says: " We think that in each case the court should look into the facts, circumstances and nature of the transaction and determine the nature of the dividend and the rights of the contending parties according to justice and equity." He then quotes with approval Thompson on Corporations (2d ed., § 5414), in which it is said: "The object of the inquiry in every case should be to do justice to the life tenant and remainderman, and at the same time effectuate the intention of the creator of the trust; and on this theory, in order to effectuate such intention and to do justice between the parties, a court may, under the circumstances of a given case, apportion a dividend between the life tenant and the remainderman."

Judge CHASE then reaches this conclusion: " 1. Ordinary dividends, regardless of the time when the surplus out of which they are payable was accumulated, should be paid to the life beneficiary of the trust. 2. Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

It is conceded by counsel and it should be held that in the case of an ordinary sale by an executor of shares of stock held in trust for a life beneficiary with remainder over, the life beneficiary is not entitled to cause an investigation into the accounts of the corporation or corporations whose stock is sold and have determined and apportioned and paid to him the proportionate part that might in equity be said to represent surplus profits of the corporation or corporations during the period of the trust. Consequences of enforcing apportionment in all such cases are readily apparent and should be sufficient to make the court hesitate even if it were inclined to adopt such rule. It is sound business policy to carry some substantial part of a corporation's earnings into surplus, not only to enable the payment

of dividends in lean years, but to prevent disaster to the corporation in a year of loss.   The corporation itself and all of its stockholders are entitled to have such a policy pursued, and to deny such right would be a substantial injustice to the corporation and to all of its stockholders.   Where a stockholder is a trustee the remainderman is necessarily interested in having the corpus of the trust estate protected by the maintenance of a reasonable and safe surplus.

But it is said that this consideration is of no importance when the stock has been sold by the trustee, for then the only question is what is a proper apportionment of the proceeds in the hands of the trustee.   While the consideration referred to may not be determinative, it is very suggestive.   Concededly, while the stock is held by the trustee, the *cestui* is entitled to a distribution of surplus earnings over dividends actually declared only by showing bad faith on the part of the directors.   (*Matter of Rogers*, 161 N. Y. 108, 112, 113.)   Having no right, in the absence of bad faith, to obtain, use for his own purposes or dissipate the surplus earnings, over dividends declared, during the period that the trustee holds the stock as an investment, it is not clear how any different or greater right is created by the mere act of the trustee in changing the form of the investment.   Neither can it make any difference in principle whether the stock be sold to the issuing corporation or sold on the stock exchange.   The fundamental basis of an apportionment of earnings or profits of a corporation, between a life beneficiary and a remainderman, is that in the first instance there has been *a distribution or allotment thereof by the corporation*.   Until an allotment is made or a distribution takes place there are no profits accrued to stockholders and there is nothing to apportion.   (*Matter of Kernochan*, 104 N. Y. 618, 628, 629; *Hyatt* v. *Allen*, 56 id. 553.)

But it is said that where, as in this case, a corporation acquires its own stock and puts it into its treasury it is in effect a retirement of the stock paid for out of surplus, and that this is tantamount to a distribution of surplus.   One sufficient answer to this argument is that it was shown that the stock was not paid for out of surplus.   The testimony establishes that no cash on hand, representing earnings, and no

part of the surplus was employed in paying for the stock. All of the cash paid was raised by borrowing money, partly on the security of a mortgage placed upon the corporation's real estate and partly on the corporation's note. Further, stock held in the treasury is not, even in effect, retired stock. It may be sold at any time, and in this case, if sold at the same price at which it was acquired and used to pay off the mortgage and note, the surplus at the close of the transaction would be just what it was before the stock was acquired. How then can it be fairly said that the use of the proceeds of a corporate mortgage to acquire outstanding stock to be held in the corporation's treasury involves or is tantamount to a *distribution* by the corporation of its surplus earnings? A still further obstacle in the path of any such reasoning exists in the case at bar, for the surplus, exclusive of the increase in real estate values (not involved), consisted mainly of chattel mortgages, license loans to customers, buildings and machinery, all employed as capital. So, unless the corporation was going out of business, the supposed distribution of surplus could only be theoretical.

Again, it is argued that if it be held that there was not distribution analogous to a stock dividend, the transaction should be treated as a liquidation of the corporation, at least *pro tanto*, in which case the rule of apportionment would apply. But it was not a liquidation of the corporation's business in any sense, for the corporation continued right on with its business, as was the intention that it should. The mere fact that a full half of the capital stock of the corporation was sold makes no difference, for if it were all sold and the corporation were to continue business there would be no liquidation, and the vendors, whether life beneficiaries or remaindermen, or absolute owners of the stock, would have no interest in or claim upon the surplus, and in the case of a trust estate there would be no occasion for any apportionment. But it is said that if *all* the stock were sold to the corporation itself and paid for by a distribution of the surplus, this would be tantamount to liquidation, and the same principle ought to apply when, in a closely held family corporation, one-half of the stock is sold to the corpora-

tion and paid for by a distribution of the surplus.   In the case of a sale of all the stock to a corporation, the intention being to retire the stock, it would doubtless be held that this was tantamount to a liquidation of the assets of the corporation, for it is inconceivable that a corporation would continue to do business without any stock, except treasury stock, and, consequently, without any stockholders.   No such situation exists, however, on a purchase of half the stock for, as we have seen, this corporation was to go right on doing business.   Much less would it amount to a liquidation where the stock bought and turned into the treasury, with which we are concerned, was only a small block of 500 shares.   Moreover, as we have pointed out, this 500 shares was not paid for out of surplus earnings but by borrowing money, and it was not retired, but was put into the treasury.

Finally, it is argued that, whatever the forms employed and irrespective of whether the proceeds of the sale do represent a distribution of earnings, here is a case where during the life of the trust the stock, composing the corpus, advanced in value from $200 to $415 a share and the sale price of $415 must have been arrived at by taking into account the surplus, and it must to some extent *represent* earnings that were not distributed, and which, if distributed, would go to the life beneficiary.   Why such a rule should apply here and not apply (as is conceded by appellant's counsel) in the ordinary case of a sale of stock by a trustee when he changes the form of the investment is not stated.   It is suggested that the circumstances are peculiar here in that the trustees are remaindermen.   But that makes no difference in the absence of bad faith, and there is no intimation of bad faith.   It does not even appear, as would ordinarily be the case, that in fixing a price the surplus was taken into account, for the price was fixed, as is the custom in buying a brewery, according to the testimony, on the basis of the barrelage, or annual output.   The price was arrived at by taking the barrelage, 200,000 barrels, at $5 a barrel, adding thereto the value of the real estate, and deducting the liabilities and then dividing the net amount by the number of shares.

Notwithstanding the uncontradicted testimony that the sale price of the stock was fixed without regard to the surplus, it is

insisted in the prevailing opinion that the proceeds of the sale in the hands of the trustees "represent" in part accumulated profits. Indeed that is the basis of the forceful and persuasive opinion of Mr. Justice SCOTT, which proceeds upon original grounds quite independent of the contentions advanced by the appellant. That conclusion is reached by assuming that the price paid "represented" one-half of the corporation's assets because, it is said, the stock "represented and stood for one-half of the assets." But except after liquidation, stock ownership is not ownership of a proportionate part of the assets of the corporation. "The specific thing which is the subject of the trust is not an interest in the property of the corporation, but in the shares of the corporation." (*Matter of Rogers*, 22 App. Div. 428, 437.) "A shareholder in a corporation has no legal title to the property or profits of the corporation until a division is made * * *. 'He [the stockholder] has no inchoate or other right till the dividends have been declared.' * * * The undivided profits of a corporation may never be received by the stockholders. They may be squandered or lost, and no benefit may accrue to the stockholders therefrom." (*Hyatt* v. *Allen*, 56 N. Y. 553, 557.) The chance that this surplus might readily be wiped out at any time in the ordinary course of business is particularly apparent, for it was largely invested in chattel mortgages on saloons and in loans to saloon keepers. Given the enactment of a prohibition law, this surplus would vanish over night. It does not seem to me to be accurate in a legal sense, to say that certificates of stock, or the proceeds of their sale, "represent" a proportionate part of all the assets of a corporation. The certificates merely represent certain rights of the holder; his right to vote, his right to share in dividends declared, and his right, on liquidation, to share in the property, but only after creditors have been satisfied. Furthermore, it does not seem to me that, even from a lay point of view, the price paid for the stock "represents" or is much affected by the corporation's surplus. The surplus is an element, but so is good will, future earning capacity, and the ability and character of those who control and conduct the company. As pointed out by the learned referee, when we get to trying to apportion and segregate the particular element in the agreed price repre-

First Department, May, 1917.          [Vol. 178.

senting the value attributed, in the minds of the bargaining parties, to the surplus existing at the moment, we are entering into the field of speculation and uncertainty.

So far as concerns the intimated illegality of increasing the corpus of a trust fund by accumulations from the income, the question does not arise in a case where the subject of the trust is the shares of a corporation, as was pointed out on page 437 of the opinion of Mr. Justice CULLEN, in *Matter of Rogers* (22 App. Div. 428).

It remains only to see whether any such injustice to the life beneficiary is established, warranting the court's interference, as in *Lawrence* v. *Littlefield* (215 N. Y. 561), within the rule in the *Osborne* case. Assuming that the rule in the *Osborne* case be extended to reach every case of injustice to the life beneficiary whereby the remainderman profits, irrespective of the legal forms employed, the circumstances of this case disclose no injustice. The price realized was concededly ample. It was to the interest of the trustees as individuals, apart from their duty as trustees, to get the highest possible price. Previous to the sale, the beneficiary's income was swelled by the corporation's policy of employing its surplus as capital. Subsequent to the sale, if any part of the surplus is represented in the price realized, the beneficiary will continue to benefit by it, for it will remain a part of the principal and continue to earn him additional income just as it did when it was employed as a part of the corporation's capital. Before the sale, the beneficiary had an uncertain income, based upon dividends ranging from two to twelve per centum and averaging seven per centum annually. Now he has a fixed and certain income, based upon an investment of the proceeds of the stock sold at a top price and at a period of the corporation's greatest prosperity. His only grievance is that he cannot now spend a part of the proceeds of the sale, thus not only reducing the corpus of the trust, but reducing his annual income from the trust. There is no injustice to him in the situation, and the apportionment contended for by the appellant, Albert Schaefer, was properly refused.

Another point involved is the appeal by the executors from that part of the decree holding that they should not be per-

mitted to apply presently out of the income payable to Albert Schaefer a sum sufficient to reimburse the principal to the extent of the premiums which were paid by the trustees upon the purchase of the corporate stock of the city of New York, beyond a proportionate amount each year based upon the life of each bond, so as to bring each bond to par at its maturity. It appears that about the year 1902 and during the year 1903 the trustees changed the form of the investment of a portion of the trust fund held by them for the benefit of Albert Schaefer from bonds and mortgages secured by real estate to New York city bonds and stock. Before doing so the trustees procured from Albert Schaefer a direction or letter of authority in which he authorized them to retain from the income now in or hereafter to come into their hands enough to reimburse the principal of the trust estate for the amount paid out over and above the par value of the bonds or stock and to reimburse them for any expenses incurred for the sale of the bonds and mortgages. Albert Schaefer signed this letter on the advice of his attorney but testified that he only did so on being informed by the attorney that the trustees would have the power to do it even without the letter (which was, of course, incorrect). The referee correctly held that this improvident arrangement on behalf of the life tenant should not be upheld, particularly as the remaindermen, who included the trustees, were greatly benefited by this arrangement. While the trustees had the right to amortize the premium, they were bound to take into consideration the time when each bond was payable. Otherwise, if the life tenant died shortly after the deduction of a sum sufficient to amortize the entire premium paid on all the bonds, irrespective of the maturing of the several bonds, the remaindermen would be getting the bonds below their market price at the expense of the life tenant's income. The consent of the life tenant was tantamount to an attempt on his part to assign a part of the income of the trust which had not accrued at the date of the instrument, which is invalid under section 15 of the Personal Property Law (Consol. Laws, chap. 41 [Laws of 1909, chap. 45], as amd. by Laws of 1911, chap. 327), re-enacting in amended form section 3 of the former Personal Property Law (Gen. Laws, chap. 47 [Laws of 1897, chap. 417],

as amd. by Laws of 1903, chap. 87). The proper rule is that in accord with the decision of the Court of Appeals in *Matter of Stevens* (187 N. Y. 471), followed by the referee, and his determination in this respect should be affirmed.

There is one further point to be considered, involved in the appeal of the trustees from the decree of the surrogate with respect to commissions of the trustees. It appears that the trustees rendered annual accounts to the life tenant and were, therefore, entitled to commissions at the annual rests. They did not, however, retain the full commissions to which they were entitled, claiming that during these years it was not entirely clear just what they were entitled to as commissions, the period being when the compensation of trustees on the basis of annual rests was not declared or understood with certainty. However, at the time of the last statement rendered by the trustees prior to the accounting which is the subject of this proceeding, to wit, on July 1, 1914, the full amount of income on hand was paid over to the *cestui que trust*, leaving nothing but principal in the hands of the trustees. During the time intervening between July 1, 1914, and July 31, 1914, the date of this accounting, there is nothing to indicate that the trustees received any income. On July 20, 1914, they sold $7,000 par value of New York city bonds at a loss of $1,083.66 and transferred the proceeds, amounting to $6,348.13, to the income account, thereby obtaining for the purposes of this accounting, and after the deduction of additional commissions claimed by them, the sum of $5,279.19, set forth in the account as income on hand. Out of this they propose to pay themselves the fees that they claim they were entitled to, but which they did not actually retain during the period of the payments referred to. I think that under all the circumstances the surrogate was correct in holding them to the rule stated in *Cook* v. *Stockwell* (206 N. Y. 481), that, having retained commissions upon the income paid by them, they will be deemed to have waived any commissions to which they were entitled in excess of the amount retained.

Accordingly, the decree of the surrogate should be affirmed, without costs.

DAVIS, J., concurred.

Decree modified as indicated in opinion, with costs to objector, appellant, payable out of the corpus of the trust fund, and matter remitted to surrogate as directed in opinion. Order to be settled on notice.