In the Matter of the Estate of JAMES H. AYVAZIAN, Deceased.

Surrogate's Court, Kings County, November 9, 1934.

*Dicran Simsarian*, for Peter Memleketian and another.

*William Lurie*, for the American Surety Company of New York.

*John J. Hanrahan*, for John Ayvazian and another.

WINGATE, S. It would be difficult to imagine a more confused and complicated situation than that in which the present executors and trustees have involved themselves in their management of this estate. This condition is further accentuated by the fact that a surety is concerned in their liability in their trust capacity, but is not responsible for their acts as executors, and that the fiduciaries have wholly failed to differentiate the capacities in which their several acts were performed.

The will, as far as here material, created a life estate for the testator's widow, Lucy Ayvazian, in the sum of $1,000, made general

bequests of $500 and $100 to his sister, Anna Pinajian, and the Armenian church, respectively, created a trust for his sons, John and Horan, with a corpus of three specified parcels of real estate and made them general residuary legatees in the proportions of one-third and two-thirds.

The terms of the trust directed the payment of the income to the sons " until they attain the age of thirty years, at which time the said property shall be turned over to them." During their minorities, the income was to be accumulated with a discretionary power in the fiduciary to apply portions thereof for their support and maintenance, and was payable to them after they, respectively, attained the age of twenty-one.

The present accountants qualified as fiduciaries in 1921, succeeding the executor and trustee first named in the will, who had partially administered the estate. By the terms of the decree then entered, the substituted executors were directed to continue to hold the $1,000 fund in which the wife possessed a life interest unless or until she gave a bond, to hold the $500 bequest for Anna Pinajian pending adequate proof of her death and to hold the $100 bequest for the Armenian church until a safe means of transmission could be found. The remaining sum of $1,138.33 in the hands of the superseded executor and the sum of $483.63 in his hands as trustee, were also directed to be paid to the successor fiduciaries.

It appears from " Schedule E " of the account filed at that time that other legatees under the will had been paid, and that the executor had advanced to himself as trustee the sum of $1,275.65 from the general funds of the estate " to prevent foreclosure of mortgages."

According to the present account, the accounting fiduciaries duly received from their predecessor, as executors, the foregoing sums, totalling $2,738.33, and also received in their trust capacity the $483.63 mentioned in the decree.

The status of the holdings by the accountants immediately succeeding the execution of the 1921 decree was, therefore, that they held in their executorial capacity:

| | |
|---|---:|
| Principal of life estate of Lucy Ayvazian | $1,000 00 |
| Legacy of Anna Pinajian | 500 00 |
| Legacy of Armenian church | 100 00 |
| Cash received from their predecessor | 1,138 33 |
| Total in cash | $2,738 33 |
| To which should be added the sum loaned to the trust account to protect its properties | 1,275 65 |
| Giving a total of | $4,013 98 |

In their trust capacity they held the three specified parcels of real property and the sum of $483.63 in cash, which represented income of the trust, subject to a debt owed to themselves in their executorial capacity amounting to $1,275.65. It is ascertainable from Schedule C-1 of the 1921 account that this loan was made up of $1,250 paid on account of principal of mortgages on the trust properties, and $25.65 expenses of extending the mortgages, all of which were principal disbursements.

The substituted executors and trustees were residents of California, and since, by reason of that fact, they were unable personally to attend to the management of the trust properties, they appointed John Ayvazian, one of the residuary legatees and a trust beneficiary, to act for them in this regard, and he continued to do so, up to the time of the present accounting.

His receipts in this connection are demonstrated to have been:

| | | | |
|---|---|---|---|
| 6 Seeley street............ | $6,544 35 | | |
| | 569 00 | | |
| | | $7,113 35 | |
| 257 Windsor place........ | 7,945 50 | | |
| | 760 00 | | |
| | | 8,705 50 | |
| 487 Sixth avenue.................... | | 2,327 00 | |
| Giving total receipts of...................... | | | $18,145 85 |

His expenditures in connection with these properties were:

| | | | |
|---|---|---|---|
| 6 Seeley street............ | $4,296 69 | | |
| | 488 19 | | |
| | | $4,784 88 | |
| 257 Windsor place........ | 8,537 20 | | |
| | 848 9 | | |
| | | 9,386 16 | |
| 487 Sixth avenue.................... | | 1,809 73 | |
| | | | 15,980 77 |
| Giving a net income of the trust of............. | | | $2,165 08 |

No part of this sum was forwarded to California, all, except the amounts of the disbursements hereinafter noted, being at the date of the account still in the hands of the New York agent.

The Seeley street and Windsor place properties, which were a part of the original trust *res*, are still contained therein, but the Sixth avenue property was sold in 1922 for the sum of $5,204.53,

the net sum of $5,104.53 having been transmitted to the fiduciaries in California, the remaining $100 being included in the foregoing disbursements on account of this property. This sum was obviously trust principal and $4,500 thereof was "invested" by them in a note which is presently worthless.

There remain for consideration nine items of expenditure listed in the account. Three of these, namely, $166.70 for bond premiums, $435 for a monument over testator's grave, and $100 for legal expenses, were paid from the funds in the hands of the agent in New York. Of these the first and third were trust expenses, properly chargeable to income (*Matter of Shepard*, 136 Misc. 218, 220), and the second was an executorial disbursement. (*Matter of Smallman*, 138 Misc. 889, 893; *Matter of Boyle* 140 id. 523, 525; Sur. Ct. Act, §§ 216, 314, subd. 3.)

The remaining six were paid from California, and consisted of miscellaneous disbursements, $250; "legal services for Horan and John Ayvazian" in 1921, $225; legal services in connection with the present accounting, $250 and $150; a payment for the care and maintenance of Horan Ayvazian, $728, and two payments aggregating $1,200 to John Ayvazian "on account of his share." In view of the dearth of facts adduced on the hearing before the referee, the proper allocation of these items is, in certain instances, not entirely free from doubt. Since the activities of the fiduciaries during the period embraced in the present account almost wholly concerned the trusts, the miscellaneous item of $250 will be allocated thereto, being payable from income on the principles laid down in *Matter of Shepard* (*supra*). Since the accounting of 1921 was almost wholly executorial and because the holdings of cash of the fiduciaries in that year were preponderantly executorial, the payment of $225 for legal services then made is allocated to the executorial account. The items for counsel fees of the present accounting, aggregating $400, apply both to the executorial and trust functions, and will be prorated approximately in proportion to the sums accounted for in the two capacities. This apportions twelve per cent, or $48, against the executorial account; twenty-nine per cent, or $116, against trust principal, and fifty-nine per cent, or $236, against trust income.

The payment of $728 for the support and maintenance of Horan is obviously intended to be on account of trust income since its designation complies precisely with the authorization to this effect contained in the trust provision of the will.

Equally obviously, the payment of $1,200 to John must have been intended as a payment of his distributive share in the residue of the estate. He was entitled to payments on this account and

also of trust income. Since, however, the funds for the payment of the former only were in the hands of the fiduciaries personally, an inference results that they intended the payment to apply on this account, since if they had intended it as a payment of trust income, their natural course would have been to authorize him to pay himself out of the moneys which he held as agent.

The results of the foregoing analyses, excluding the unsold realty from the computations, are as follows:

| The fiduciaries received on qualification: | Executorial account | Trust principal account | Trust income account |
|---|---|---|---|
| Ayvazian legacy....... | $1,000 00 | .......... | .......... |
| Pinajian legacy........ | 500 00 | .......... | .......... |
| Church legacy......... | 100 00 | .......... | .......... |
| Cash................. | 1,138 33 | .......... | $483 63 |
| Claim against trust principal account.......... | 1,275·65 | .......... | .......... |
| Obligation to executorial account............... | .......... | —$1,275 65 | .......... |
| They received from operation of trust properties. | .......... | .......... | 2,165 08 |
| They received from sale of trust investment....... | .......... | 5,204 53 | .......... |
| Total net receipts.... | $4,013 98 | $3,928 88 | $2,648 71 |
| They expended: | | | |
| Bond premiums........ | .......... | .......... | $166 70 |
| Monument............ | $435 00 | .......... | .......... |
| Legal expenses........ | .......... | .......... | 100 00 |
| Miscellaneous expenses. | .......... | .......... | 250 00 |
| Legal services, 1921.... | 225 00 | .......... | .......... |
| Legal services this accounting.......... | 48 00 | $116 00 | 236 00 |
| Maintenance Horan.... | .......... | .......... | 728 00 |
| Payments John........ | 1,200 00 | .......... | .......... |
| Total expenditures. | $1,908 00 | $116 00 | $1,480 70 |
| They should have balances | $2,105 98 | $3,812 88 | $1,168 01 |

Summarizing the foregoing, the fiduciaries should have in their possession, exclusive of the equities in the two remaining parcels of real estate, the following sums:

| | | |
|---|---:|---:|
| On executorial account | $2,105 | 98 |
| On trust principal account | 3,812 | 88 |
| On trust income account | 1,168 | 01 |
| Total | $7,086 | 87 |

They have on hand according to their accounts:

| | | |
|---|---:|---:|
| Executorial cash | $538 | 33 |
| Trust cash general | 635 | 16 |
| Trust income in New York | 1,413 | 38 |
| Note " investment " | 4,500 | 00 |
| | $7,086 | 87 |

Excluding for the present questions respecting the devastavit accomplished by the unauthorized placing of fiduciary funds in an unsecured loan, and the further questions respecting liability for interest, it is apparent that the residue in the hands of the executors, without deduction for payments in the nature of distributions, should be $2,413.98, less the expenditure of $435 for the monument, and $48 for legal services, or a net sum of $1,930.98. Under the terms of the will Horan was entitled to receive two-thirds of the residuary estate, amounting to $1,287.32, and John, one-third, or $643.66. Charging against each one-half of the legal expenses of 1921, it appears that Horan has received $112.50 and is still entitled to $1,174.82, and John has received $1,312.50, which is an overpayment of $668.84.

The net income of the trust, after expense deductions, amounted to $1,896.01, of which each brother was entitled to one-half, or $948.05. Horan has received $728, wherefore $220.01 is still due him; John, having received nothing, is still entitled to $948.

It thus appears on the present figures, which are subject to amendment by reason of allowances for commissions and expenses, that the accounts of the sons stand as follows:

| | | |
|---|---:|---:|
| Due Horan from executorial funds | $1,174 | 82 |
| Due Horan from trust income | 220 | 01 |
| Total due Horan | $1,394 | 83 |

| | | |
|---|---:|---:|
| Due John from trust income | $948 | 00 |
| Due from John on executorial account | 668 | 84 |
| Total due John | $279 | 16 |

Returning now to the consideration of the situation arising by reason of the sale of the Third avenue property and the transmission of the avails to California and their loan by the trustees to the extent of $4,500 on an unsecured note, it is, of course, obvious that upon their receipt by the trustees these funds were automatically impressed with two trusts, the *first*, to the extent of $1,275.65, in favor of the same individuals in their executorial capacity, to make good the borrowing from the executorial account, in which relationship they were distinct and separate persons from themselves as trustees (*Matter of Ebbets*, 149 Misc. 260, 266 *et seq.*), and the *second*, as to the balance of the fund, in favor of Horan and John, the *cestuis* of the express trust.

In their investment of these two trust funds they committed a *devastavit*, for which they and their surety must be compelled to respond.

It is obvious from the restatement of their accounts hereinbefore made that the principal sum by which their valuable assets are deficient is the amount loaned on this unsecured note which is admittedly worthless. The elaborate argument of the surety to the contrary is based upon the assumed premise that a trustee will be allowed to repair an admitted loss of principal assets by a use of the trust income. The mere statement of such a position involves its refutation. The income earned by the other portions of the trust fund became the equitable property of the *cestuis que trustent* immediately upon its receipt, and was not lawfully to be diverted from them for any purpose whatsoever, least of all for the solution of the personal obligations of the trustees resulting from their illegal dealings with the principal funds.

Such stress is laid by the trustees' surety on the alleged acquiescence of the *cestuis que trustent* in the act of unlawful investment that it will be of some utility to spend a moment in the consideration of the principles underlying such a contention.

" Acquiescence as a defense has, speaking generally, a dual nature. It may, upon the one hand, rest upon the principle of ratification, * * * or it may, upon the other hand, rest upon the principle of estoppel, and may be denominated equitable estoppel." (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113, 129.)

As pointed out by the court in the last cited case, ratification may be either express or implied, but in either case, to furnish a valid defense, the pleader must demonstrate that the act of ratification was performed with a full knowledge of all material facts relating to the transaction and a complete appreciation and understanding of his resulting legal rights. (*Adair* v. *Brimmer*, 74 N. Y. 539, 554; *Matter of Long Island L. & T. Co.*, 92 App. Div. 1, 4; affd., 179

N. Y. 520; *Matter of MacNeil*, 165 App. Div. 842, 844; *Smith* v. *Howlett*, 29 id. 182, 190; *Gould* v. *Gould*, 126 Misc. 54, 74; *Luers* v. *Brunjes*, 5 Redf. 32, 42.) It is, in essence, a waiver of existing rights which can be predicated only upon a like demonstration. (*S. & E. Motor Hire Corp.* v. *N. Y. Indemnity Co.*, 255 N. Y. 69, 72; *Hayden* v. *Mathews*, 4 App. Div. 338, 341; affd., 158 N. Y. 735; *Callahan* v. *Switchmen's Union of North America*, 189 App. Div. 5, 10.)

In the case at bar nothing even approximating a waiver of rights by the *cestuis que trustent* in respect to the devastavit of the accountants has been demonstrated. True, they remained silent and inactive for a time after its discovery, but " silence and inaction are not significant of surrender till notice of invasion becomes a challenge to resistance." (*O'Connor* v. *Collins*, 239 N. Y. 457, 462.) Mere indulgence to a wrongdoer without demonstration of a change of position rightfully accomplished by him in reliance thereon has never resulted in the creation of an estoppel against or the impairment of the right to reparation possessed by the injured party. Such a defense " only becomes available when the failure to assert the right has given rise to circumstances rendering it inequitable to permit the exercise of the right after a long lapse of time." (*Hydraulic Power Co.* v. *Pettebone-Cataract P. Co.*, 198 App. Div. 644, 653.) (See, also, *Matter of Tuozzolo*, 145 Misc. 485, 490, 491.) Here nothing remotely resembling such a situation has been demonstrated. The authorities cited by the surety enunciate no different rule and their facts are in no wise pertinent to the situation here disclosed. It follows that the trustees are surchargeable on principal account with the amount of loss in the sum of $4,500 incurred in consequence of their improper investment. (*Matter of Adriance*, 145 Misc. 345, 349; *Matter of McCafferty*, 147 id. 179, 198.)

The determination of the remaining questions raised by the demonstration of the account is affected by the issues submitted under the pleadings. A compulsory accounting proceeding was originally instituted by petition filed by John Ayvazian on April 29, 1929. Although citation therein was issued and served, the proceeding appears not to have been pressed and nothing directly transpired as a result thereof. On June 23, 1930, the fiduciaries instituted a voluntary proceeding and simultaneously filed an account, but in defiance of the direction contained in an order dated August 1, 1931, took no steps to procure its judicial settlement. They thereafter on October 22, 1932, filed a new voluntary petition accompanied by a new and different account. A waiver and consent to the judicial settlement of the account of the fiduciaries,

signed by John, Horan and Lucy Ayvazian, was filed November 2, 1932. This document did not specify to which of the two accounts on file the beneficiaries assented, which question was very material, since the earlier account debited the accountants with interest at four per cent on the $1,500 of executorial funds which they had held since 1921, and with like interest on the proceeds of the sale of the Third avenue property, making no mention of the improper note investment, whereas the second account eliminated both of the interest items and set forth the investment of $4,500 in the note. On December 14, 1932, objections " to the account " (again unspecified) were filed on behalf of John and Horan. An account supplementing the second account was filed on April 4, 1933, and it was the settlement of this and of the second account which was submitted to the referee herein.

Upon the hearings an attorney appeared as representing John Horan and Lucy Ayvazian, and he has likewise appeared in the same capacity before the court on the motion in respect to confirmation of the referee's report.

Counsel for the surety argues that by reason of the filed waiver and consent, these parties have no standing before the court. Had only a single account been filed, there might have been some plausibility to this position, although the court would unquestionably have permitted them to withdraw their consent and object, had timely action to that end been taken. Here, however, it is at least arguable that whereas the parties were willing to assent to the settlement of the first account, they were not similarly complacent respecting the second. This position is reinforced by the fact that the objections which were filed were addressed to the particulars in which the second account differed from the first. Since their action in this regard was timely and has prejudiced no one, it will be determined that the waiver and consent was without effect.

It results that judiciable objections are validly in the record on behalf of John and Horan. These, however, do not aid the position of Lucy, and since she has failed to object, the account must be taken *pro confesso* as against her in spite of the fact that she was represented on the hearings.

On primary principles, a party will be heard to object only in respect to matters adversely affecting his own interests. It follows from this that since the failure profitably to employ the $1,000 and $100 legacies to Lucy and the Armenian church in no wise injured the only objectants to the account, they cannot be made the basis of a surcharge.

Aside from the objection respecting the improper $4,500 investment, the complaints are addressed to the failure of accountants

to charge themselves with interest on the sums in their hands as executors, and to make productive the $4,500 improperly invested. The duty of a fiduciary, whether executor or trustee, profitably to employ funds in his hands under penalty of personal liability for his neglect so to do is fundamental. (*Shuttleworth* v. *Winter*, 55 N. Y. 624, 631; *De Peyster* v. *Clarkson*, 2 Wend. 77, 87, 88; *Dunscomb* v. *Dunscomb*, 1 Johns. Ch. 508, 510; *Blauvelt* v. *De Noyelles*, 25 Hun, 590, 592, 593; *Matter of Philp*, 29 Misc. 263, 264; *Matter of Katz*, 127 id. 16, 19; affd., 219 App. Div. 783; *Matter of Gargiulo*, 138 Misc. 90, 97; *Matter of Kruger*, 139 id. 907, 908; *Matter of Taft*, 145 id. 435, 441.)

The restatement of the accounts of the accountants hereinbefore set forth demonstrates that from 1922, when the Third avenue property was sold, continuously to the present time, the trustees had in their hands the clear sum of $3,812.88 (from which $100 expended in connection with the sale is to be deducted), which was trust principal, from which, by reason of their improper acts, not a single cent of revenue has been received. Their obligation in this connection is to place the *cestuis que trustent* in the same position in which they would have been had their acts conformed to their primary obligations of diligence and prudence. (*Matter of Greenberg*, 149 Misc. 275, 276.) If this sum had been placed in United States Liberty bonds or even in a savings bank, it would have yielded at least four per cent per annum compounded semi-annually. This is the amount by which the trust beneficiaries have suffered by reason of the dereliction of the trustees, and consequently is the measure of their damage in this connection.

On the executorial account, excluding the $1,000 legacy to Lucy and that of $100 to the Armenian church, the executors, up to November 3, 1930, had in their hands for distribution the clear sum of $2,205.98. There was no excuse for their failure to distribute $1,705.98 of this sum to the residuary legatees. It was a debt due to the latter and there appears no reason for applying in this connection a rule differing from the ordinary penalty for non-payment of a debt, namely, simple interest at six per cent. (*Matter of Harned*, 140 Misc. 151, 153; affd., 234 App. Div. 796; *Matter of Kruger*, 139 Misc. 907, 908; *Matter of Stulman*, 146 id. 861, 868; *Matter of Taft*, 144 id. 896, 899, 900; *Matter of Taft*, 143 id. 387, 391; *Matter of Burroughs*, 137 id. 844, 852; *Matter of Berbling*, 134 id. 730, 731.) This sum was due, $1,174.82 to Horan and $531.16 to John. Horan's portion is still totally unpaid, so that in respect to his share the same six per cent simple interest is to be continued to the date of actual payment. On November 3, 1930, John was paid $1,000, which was an overpayment of $468.84, and

on January 26, 1931, an additional overpayment of $200 was made to him. He is under obligation to refund these sums to the executors with six per cent simple interest from their respective dates of payment to him.

One remaining question of interest arises on the executorial account in respect to the $500 legacy under the will to Anna Pinajian. If, as was claimed, but not proved, at the time of the prior accounting, she predeceased the testator, this amount became due to the residuary legatees. The executors have held the sum during the intervening thirteen years without any apparent attempt to ascertain the fact. Their obligations in respect to making this sum productive corresponded with their duties regarding the trust funds, and they will, accordingly, be surcharged with interest at four per cent semi-annually in respect thereof. This is a question properly raised by the objections of John and Horan, since, if Anna actually predeceased the testator, the amount of her legacy would fall into the residue of the estate and be payable to them as residuary legatees.

Turning now to the trust income receipts, it is unquestionable that it was the duty of the trustees either to distribute this income after reasonable reservations for expenses of the conduct and maintenance of the real estate, or to reinvest it. No sufficient demonstration has, however, been made as to the dates of receipt of such income, or what sums might properly be reserved to enable the court to fix with any approximation of accuracy the dates when particular sums should have been paid over. Any attempt to surcharge on this account would, therefore, be merely guess work in which the court should not indulge. (*Von Reitzenstein* v. *Tomlinson*, 249 N. Y. 60, 67; *Searles* v. *Manhattan Railway Co.*, 101 id. 661, 662; *Lucas* v. *International Paper Co.*, 131 App. Div. 368, 371; *Heinbach* v. *Doubleday, Page & Co.*, 130 id. 34, 37; *Blaikie* v. *Post*, 137 id. 648, 651.)

The final question in the case concerns the allowance or disallowance of commissions to the accountants. It is of course well established that where a fiduciary has been guilty of culpable misfeasance or non-feasance in office, the determination of his right to the statutory compensation is wholly discretionary with the surrogate. (*Matter of Rutledge*, 162 N. Y. 31, 34; *Matter of Taft*, 145 Misc. 435, 436.) In spite of the apparent *bona fides* of these executors and trustees, a denial of compensation to them would, on the facts demonstrated, be well within the pertinent decisions. They have been guilty of neglect and maladministration of duties (*Stevens* v. *Melcher*, 152 N. Y. 551, 583; *Cook* v. *Lowry*, 95 id. 103, 114); they have neglected to keep adequate accounts (*Matter of*

*Hutkoff*, 124 Misc. 703, 704); they have intermingled their accounts to an atrocious degree (*Matter of Welling*, 51 App. Div. 355); they have delayed for over half a generation the settlement of their accounts (*Matter of Welling, supra*), and have failed to make proper payments to the beneficiaries (*Matter of Wotton*, 59 App. Div. 584, 588; affd., 167 N. Y. 629).

Whereas, however, the court would, on the authorities, be amply justified in denying all commissions, it deems the adoption of such a course in respect to all portions of the account too drastic a penalty. Respecting the trust income, equity does not require that any consideration be shown the trustees. They did absolutely nothing in connection with the management of the properties, leaving this wholly to John Ayvazian, who has never received a cent of remuneration therefor. To have him perform all of the labor and suffer all of the worry of conduct of these properties for thirteen years and then, in effect, to make him pay for the privilege by a charge against his distributive share of the proceeds, does not accord with the court's conception of justice. Commissions on trust income will, accordingly, be denied.

The conduct of the fiduciaries respecting the trust legacy to Lucy, and to a lesser degree in connection with that to the Armenian church, has been atrocious. The former, in particular, has been wholly deprived for thirteen years of her sole testamentary gift, namely, the use of this fund, and the court will not assent to a remuneration of the executors for such mismanagement. Any commissions in respect to these two items are accordingly denied. As to the remaining items of the executorial funds and the trust principal, the fiduciaries will, as a result of this decision, have made good all losses caused by them in respect thereto, and may, therefore, be allowed commissions thereon in so far as they may be payable according to usual rules.

At the time of the former decree the legacy of Anna Pinajian was directed to be held pending proof of her predecease of the testator. Apparently the executors have made no efforts to clear up this question. In any event there is presently no more before the court to warrant a finding of fact in this connection than there was on the previous occasion. The direction for a continued holding will, therefore, be repeated, with the further admonition that it will be a primary duty of the new fiduciary to produce adequate evidence on the subject without delay.

Finally, the former decree contained a direction that the principal of the $1,000 legacy for Lucy Ayvazian should be retained by the executors unless or until she posted a bond in this sum, which she has so far failed to do. It is now proposed to substitute her

as fiduciary. Of course she will not be permitted thus to circumvent the direction of the court in this regard, and the issuance of letters to her will be conditioned upon her filing a bond, in an amount sufficient to protect the ultimate distributees, which amount shall include this sum.

In so far as the report of the referee does not coincide with the views hereinbefore expressed, it will be modified to conform hereto. In all other respects it will be confirmed.

Enter decree on notice accordingly.