In the Matter of the Estate of GEORGE M. OLCOTT, Deceased.

Surrogate's Court, Kings County, January 26, 1937.

*Morgan & Lockwood,* for the City Bank Farmers Trust Company, petitioning trustee.

*Alexander & Green,* for Mary Olcott, daughter, respondent.

*Joseph A. Kennedy,* special guardian for the infant great grand-children, contingent remaindermen.

WINGATE, S. Two questions are presented for determination in this proceeding. The first is one of testamentary interpretation and relates to the authority, if any, of the life beneficiary of a trust created by the will respecting investments of the principal funds

thereof. The second concerns the manner of allocation, as between principal and income of a stock dividend on certain shares of the Federal Insurance Company in which a portion of the principal funds of the same trust are invested.

The court cannot but compliment all parties to the proceeding upon the extremely helpful memoranda which they have submitted in aid of a proper solution of the issues, and especially for the masterly restraint which they have displayed in abandoning the prevalent and pernicious practice (*Matter of Crespi*, 158 Misc. 383, 384, and authorities cited) of citation of particular precedents on the question of interpretation.

As in every other question of similar type, the sole pertinent inquiry on the first question presented for discussion is as to what this particular testator intended by the words employed by him in the documentary exposition of his wishes.

The particular paragraph of the instrument which is the genesis of the instant controversy is a part of the item designated nineteenth. Therein, the Franklin Trust Company is appointed executor and trustee of the several trusts erected by the preceding items of the will, whereupon there follows this enumeration of its powers and authorities:

" I give and grant the said Franklin Trust Company for the purpose of this will, full power to lease, sell and convey any real estate not herein specifically devised but including property devised in trust for the benefit of my daughter Cornelia A. Booth.

" I empower the said Franklin Trust Company to make any necessary deeds; to compromise any claims in favor or against my estate; to partition by deed or other proper instrument property which I may hold myself or own in common with others, and in making such partition I empower them to assign specific securities or specific portions of securities.

" Further I empower my trustee to retain investments which I have made including corporate stocks and to make investments in such securities as it may deem judicious, not limiting it to such investments as may be technically required in the investment of trust funds. * * * *It is, however, my wish that said trustee shall not make any investments or retain any investments to which my wife, or my daughter Mary may make written objection.* * * *

" At my death, my daughter, Mary Olcott, will furnish upon request to my executor and trustee under this my will a detailed statement of all my assests and liabilities (if any) as of the date of my death." (Italics not in original.)

The particular problem propounded concerns the proper inter-pretation of the sentence hereinbefore italicized; whether it is con-

struable as a mandatory limitation on the authority of the trustee or is to be deemed merely precatory, and only the expression of a desire which, while perhaps imposing moral obligations, has no legally binding effect.

The learned special guardian for possible contingent remainder-men adopts the latter view, basing his argument to some extent, at least, on the asserted analogy of the present situation to that of a clear testamentary gift followed by a conflicting limitation which is couched in language possessing inferior clarity, under which circumstances, the earlier direction is uniformly given preponderant effect. (*Matter of Rooker*, 248 N. Y. 361, 364; *Matter of Rossiter*, 134 Misc. 837, 841; affd., 229 App. Div. 730; affd., 254 N. Y. 583; *Matter of Friedman*, 160 Misc. 494, 495, and authorities cited.)

His argument is mainly predicated on the thesis that the italicized limitation on the powers previously granted the trustee is stated merely as the testator's " wish," while the previous authority for investment is express.

Whereas it is entirely true that the word " wish " is frequently accorded a mere precatory connotation, it is equally uncontro-vertible that this and similar expressions may create positive and enforcible obligations. Slightly paraphrasing the pertinent state-ment of *Phillips* v. *Phillips* (112 N. Y. 197, 204): " Without a detailed consideration of the cases, it is quite clear, that, as a general rule, they turn upon one important and vital inquiry, and that is, whether the alleged bequest is so definite * * * as to be capable of execution by the court, or whether it so depends upon the discretion " of the person whose action in the premises is contemplated " as to be incapable of execution without super-seding that discretion." The court in that case thereupon notes that in the latter instance the use of such words can be given no obligatory effect, whereas in the former, such force may be accorded them " if such appears to have been the testamentary intention."

It is apparent that the former alternative is clearly open in the present instance and that an interpretation is conceivable which would permit the exercise by the trustee of the wide general powers for unlimited investment and retention which the testator obviously intended to be usually applicable, but would simul-taneously accord to his wife or daughter a veto power over specified individual securities of which they did not approve. The question thereupon resolves itself into one of determining whether this wish is reasonably deducible as the actual testamentary intent.

Axiomatically, the will of the testator is to be gleaned from a study of the testamentary script as a composite entirely. (*Matter of Wolanski*, 157 Misc. 470, 471, and authorities cited.) Since

it is patent from even a cursory perusal of the document that it is the product of the labors of a competent and experienced draftsman, it follows that light on the connotation to be attributed to the expressed " wish " in the present connotation may be anticipated from other clauses and directions of the instrument (*Matter of McGowan*, 134 Misc. 409, 410, 411; affd., 228 App. Div. 779; affd., 254 N. Y. 513; *Matter of Corlies*, 150 Misc. 596, 599; affd., 242 App. Div. 703) and its examination does not prove disappointing to such hopes.

As changed by the codicil, the will contains thirteen dispositive items, making seven outright gifts, erecting five trusts and giving one life estate. In the first category are bequests of testator's jewelry and personal belongings and his household furniture, etc., to his wife, or in the event of her predecease, to his daughter Mary; legacies of shares of Dodge & Olcott stock, 500 to Mary, 500 to daughter-in-law, Zita, and 250 to son-in-law, James, and cash of $5,000 to niece, Florence, and $1,000 to his coachman. The life estate was of his country property to his wife with remainder to his daughter Mary; and the trusts, of his Manhattan house and 500 shares of Dodge & Olcott stock to his daughter Cornelia; 250 shares of the same stock for five named grandchildren; $25,000 for his sister Elizabeth; $50,000 for his sisters Anna and Martha and their survivor and the residue of the estate for his wife and daughter Mary. The remainders of all of the trusts were directed to his grandchildren.

It will be seen from this resume that at least from among testator's immediate family, the widow, and his daughter Mary, to whom the questioned authority respecting investments is granted, are his chief beneficiaries. This, however, but imperfectly reflects the obvious preference of the testator for, and his confidence in, and reliance upon the judgment of these two individuals.

In item fifth the testator gave to the trustee in trust for his daughter Cornelia the premises 129 West Seventy-seventh street, Manhattan, so long as she desired to reside therein. The fiduciary is given power to lease or sell this property upon the happening of certain events " as it in its discretion may deem for the best interest of my estate," this authority, however, being thereupon limited by the express condition; " but the executor shall not sell said premises during the life or on the death of my daughter Cornelia A. Booth, except upon the written approval of either my wife Jennie A. Olcott or in case of her death, incapacity or failure to act, of my daughter Mary Olcott."

In the same connection, the testator directs, " upon the death of my said daughter this trust shall terminate, and I thereupon

authorize and empower my executor and trustee herein named, with the written approval of my wife or daughter Mary as above provided, to sell said premises."

Later, in the same item, the following language is encountered: " In the managing, leasing or sale of the said property the trustee may be governed by the direction from time to time of my wife, or in case of her decease or incapacity or failure to so direct then of my daughter Mary Olcott, and my trustee shall be exonerated and held harmless from any liability as to such acts in the management, leasing or sale of said property upon showing that it has acted in accordance with such directions."

In connection with the conduct of the personal property in the trust erected by the fifth item of the will, the instrument provides: " In paying over or applying the income of the trusts created by this the Fifth paragraph of my will, the trustee may be governed by direction from time to time of my wife, or in case of her decease or incapacity or failure to so direct, then of my daughter, Mary Olcott, and my trustee shall be exonerated from any liability as to such payments or applications of income upon showing payment or applications in accordance with such directions."

In the second item of the codicil the testator leaves to the judgment and discretion of his wife and daughter Mary the amount and manner of use of the income derived from the trust thereby created.

Finally, the last clause of item nineteenth, as noted, reads: " At my death, my daughter, Mary Olcott, will furnish upon request to my executor and trustee under this my will a detailed statement of all my assets and liabilities (if any) as of the date of my death."

These repeated demonstrations render the conclusions inevitable not only that the testator's wife and his daughter Mary were fully acquainted with his affairs and completely in his confidence, but that he reposed the most implicit reliance upon their judgment and discretion and desired, at least in a measure, to perpetuate through them that conduct of his affairs which he himself would approve and which his experience demonstrated their supervision thereof would assure.

The word " wish " occurs in some form on several occasions in the will. In item second, " as would accord with my wishes; " in item fifteenth (revoked), " it is my wish and request; " and this last phraseology again appears in item second of the codicil. In each of these instances, however, the testator immediately thereafter expressly provides that the statement of his wishes shall not restrict the provisions to which such wishes refer. The absence of

such provision in the direction under discussion strongly indicates that the word is there used with an imperative or mandatory connotation.

This is further emphasized by the phraseology employed in items third to fifth, inclusive. In the third the testator says, " it being my wish; " in the fourth, " it being my intent and wish," and in the fifth, " it being my wish and intent." As so used, on each of these occasions, the word is clearly employed in an imperative and mandatory sense, and as synonymous with " will."

By reason, therefore, of the obvious confidence reposed by the testator in his wife and daughter Mary, and his repeated grant to them of supervisory authority in the manner of execution of his testamentary desires and, finally, the demonstration that whenever the word " wish " was elsewhere employed in the will without explanatory modification or qualification it was equivalent to a mandatory direction, the conclusion is irresistible that in the disputed direction it is to be accorded a like interpretation. The testator was apparently willing to give the corporate trustee a broad discretion in investment but, rather than place the affairs of those nearest and dearest to him within its wholly untrammeled powers, he imposed a veto check thereon in the hands of these two beneficiaries of whose wisdom and probity he was utterly convinced.

Whereas, however, the court is satisfied of the effectiveness of this check upon the otherwise unlimited powers of investment and retention granted to the trustee, it does not deem its operation to be as onerous as the somewhat pessimistic contrary opinion would picture it. The duty of the trustee, like that of any other fiduciary, is to keep the fund invested and productive. It is not limited to legally authorized investments and may, therefore, as a *prima facie* matter, place the funds in its hands in any variety of investments compatible with the ordinary primary obligations of a fiduciary of diligence, prudence and good faith. (*Matter of Kruger*, 139 Misc. 907, 908; *Matter of Lewis*, 142 id. 392, 393.) As a *prima facie* matter, the only inhibition with which it is faced in this regard is in connection with specified investments or classes of investments in respect to which the wife or daughter may have made " written objection."

Not as a matter of law but of common sense and decent co-operation between those to whom the decision of the question of the placing of the funds has been confided by the testator, the trustee should, whenever it is reasonably possible and compatible with its primary obligation to make and keep the fund productive (*Matter of Ayvazian*, 153 Misc. 467, 476, 477, and authorities cited), consult with the wife or daughter respecting contemplated reinvestments.

If, however, these conditions are not present on any occasion, it may invest funds without such preliminary consultation in securities to which no written objection has previously been made, subject to an obligation for their prompt disposal if or when such written objection is subsequently received.

The foregoing determines the first question submitted. The question of allocation of the stock dividend still remains. The pertinent facts in this connection have been stipulated.

At the time of his death on September 14, 1917, the decedent was the owner of 100 shares of the capital stock of the Federal Insurance Company which then possessed an aggregate value of $46,909.

In view of the date of death and the consequent erection of the residuary trust of which these shares became a part, the amendment to section 17-a of the Personal Property Law, which enacted that, in the absence of a contrary expression in the will, stock dividends shall be deemed principal, is inapplicable, since it did not take effect until May 17, 1926 (Laws of 1926, chap. 843), and had no retroactive effect. (*Matter of Hagen*, 262 N. Y. 301, 305.) It follows, therefore, that the rules of allocation previously enunciated through the media of judicial determinations are here applicable.

The rules thus formulated were originally simple in statement but frequently difficult of application and were in part reviewed by this court in its opinion in *Matter of Frothingham* (138 Misc. 243). As there noted and as developed in authorities not therein reviewed, they may, as far as presently pertinent, be restated as follows:

*First.* In the allocation of stock dividends the value of the original corpus of the trust is to be preserved. (*Bourne* v. *Bourne*, 240 N. Y. 172, 175.)

*Second.* Gain by increment in capital valuation goes to principal. (*Pratt* v. *Ladd*, 253 N. Y. 213, 219.)

*Third.* Profits earned subsequent to the erection of the trust belong to the life beneficiary. (*Matter of Osborne*, 209 N. Y. 450, 477.)

*Fourth.* An adjudication by the directors of the corporation declaring the dividend is *prima facie* determinative of the source of the receipt upon which the payment is based (*Bourne* v. *Bourne*, 240 N. Y. 172, 177), but is subject to rebuttal by a contrary demonstration. (*Equitable Trust Co.* v. *Prentice*, 250 N. Y. 1, 8; *Pratt* v. *Ladd*, 253 id. 213, 218; *U. S. Trust Co.* v. *Heye*, 224 id. 242, 254.)

It should be observed that the foregoing statement of principles does not purport to be exhaustive or to take account of the multitudinous refinements of the applicable rules which were enunciated

up to the date of the noted enactment. They are merely the basic principles which the court deems applicable to the present situation.

The dividend now in controversy was paid pursuant to a resolution of the board of directors of the company dated February 3, 1936, which read as follows:

" Whereas, the Certificate of Amendment of the Charter of the Federal Insurance Company providing that the capital stock of the Company be increased from $2,000,000, divided into 200,000 shares of a par value of $10.00 each to $4,000,000, divided into 400,000 shares of a par value of $10.00 each, was duly approved by the Attorney General of New Jersey and filed.

" Resolved, that for each share now outstanding there be issued on February 20, 1936, to stockholders of record on February 8, 1936, one additional share representing ratably the increase in the capital stock.

" Further resolved, that payment for the 200,000 shares distributable as a stock dividend be made out of the surplus funds of the company earned since the increase of capital stock authorized April 5, 1929." (Italics not in original.)

By reason of the operation of the hereinbefore enumerated principle designated third, if this dividend was actually, as stated in the resolution of the directors, paid from earnings subsequent to April 5, 1929, the dividend would belong in toto to the life tenant.

The adoption of the resolution itself is prima facie proof of that fact under principle fourth, and the burden of a contrary demonstration is upon the special guardian who contends for an opposing result.

In a search of the stipulation of facts to ascertain whether that burden has been sustained, the first inquiry, under principle first, is naturally directed to the ascertainment of whether the value of the stock remaining in the corpus of the trust would be impaired to a value below that existing at the time of its erection by the award of this dividend to the life beneficiary. Such original value, as noted, was $46,909. The stipulation negatives this supposition, since it demonstrates that, after giving effect to the stock dividend, the value of this stock held in the corpus of the trust amounts to $47,183.25, or an increase of $274.25, which is obviously no impairment of principal.

The special guardian, however, in effect asserts that in the interval there had been an increment to principal amounting to $5,513.50 and, therefore, increasing the principal value of the stock holdings to $52,422.50, wherefore, under the enumerated principle second, principal is entitled to receive a pro tanto distribution of the present stock dividend, which he calculates to be 147.123 shares.

His conclusion is based upon the stipulated fact that on March 20, 1929, after giving effect to a previous stock dividend, the book value of the principal holdings amounted to $52,422.50. Since the present stock dividend, if wholly allocated to income, would again reduce the principal value to an approximation of the original figure at the time of the erection of the trust, he argues that this would effect an improper impairment. In other words, it is his position that between the time of the original erection of the trust and the declaration of the stock dividend of 1929 there had been an accretion to principal which, in large measure, would be deducted therefrom and paid over to the income beneficiary if her claims to the total stock dividends presently paid were validated. Stated in still another way, he maintains on the stipulated facts, that the present stock dividend is the sum of two factors, namely, earnings since the declaration of the last stock dividend and the amount of approximately $5,500, which was the increase in principal value between 1917 and 1929.

As the court sees it, the difficulty with this theory is that it runs directly counter to the express declaration of the directors of the corporation, as stated in their resolution respecting the present dividend, as noted above, that it is " made out of the surplus funds of the company *earned since the increase of capital stock authorized April 5, 1929.*"

Analysis demonstrates that these two stipulated basic facts are by no means incompatible. It may well be that the statement of the resolution is correct and that the earnings of the company since April 5, 1929, did in fact amount to a sum equivalent to the value of the stock dividend while simultaneously, during the same period, the *pro rata* of the capital value of the corporation owned by the trust decreased approximately $5,500. As is obvious, the period in question was that of the vast shrinkage in general capital values attendant upon the depression. It is wholly unlikely that the capital of this corporation was immune from participation in this general depreciation.

The question is thereupon presented as to whether the income beneficiary of a trust must be deemed a virtual insurer that any appreciation in the capital values of a trust shall be permanent. Although the court is unfamiliar with any authority which adjudges a complete affirmation of such a relationship, the first enumerated principle above noted would appear to substantially amount thereto to the extent of the original value of the principal at the time of the erection of the trust. Whether or not such a result would be attained were the question directly presented need not be made the subject of present conjecture. That it would be unfair

to the life tenant seems obvious. Such a party, in the usual case, is entitled to receive the use of the principal pending the termination of the trust. (*Matter of Albertson*, 113 N. Y. 434, 439; *Matter of Pelcyger*, 157 Misc. 913, 926, 927.) There is no reason in logic or morals except in cases of ordinary amortization, permitting courts to say that the gift of the usufruct is only a gift of part thereof. Such would be the result were portions of the income appropriated. to make good natural decreases in the value of the principal.

Conversely, the remainderman is entitled to receive only the principal fund at the termination of the period during which its use has been given to the life tenant and he should be compelled to receive it in its depreciated state if natural depreciation has occurred, in the same manner and for the same reason that he would benefit by appreciation, if this had happened.

The two gifts are of two different things and there is no reason for compelling either recipient to share a portion of his bounty with the other.

Irrespective of whether or not the courts of ultimate resort would consider the life tenant an insurer of the original value of the corpus, there has never been a judicial intimation of which this court is aware that the remainderman should receive all of the benefit of principal appreciation in boom times such as occurred prior to April 5, 1929, and be permitted to compel the life tenant to make good to him the depreciation thereof, not amounting to an impairment of the original principal of the trust, which may happen and apparently actually occurred subsequent to that date in the present case.

It is, therefore, the opinion of the court that the special guardian has failed to make any showing which would rebut the *prima facie* demonstration effected by the formal statement of the board of directors that the entirety of the present stock dividend is usufruct to which the life tenant is entitled.

It follows that both contentions of the life tenant must be sustained *in toto*.

The answer further prays that the trustee be directed to file and proceed to settle an account of its proceedings from the effective date of the last decree of settlement, and this will be done, such account to be filed and proceedings for its settlement begun within sixty days from the entry and service of the decree to be entered hereon.

Submit decree on notice in conformity herewith.