## In the Matter of the Estate of MAX DENSEN, Deceased.

Surrogate's Court, Kings County, June 1, 1937.

*Morgan & Lockwood* [*Francis J. Rogers* of counsel], for the widow, Bertha Densen, as executrix, etc., petitioner.

*George C. Franciscus*, special guardian for three infant children of decedent and beneficiaries under his will.

WINGATE, S. This case presents a somewhat unusual question respecting the relative rights of life tenant and remaindermen, or, to speak with somewhat greater precision, relating to the method of allocation of the proceeds of the sale of certain corporate stock between income and principal.

At the time of his death the decedent was the active head of a New York corporation organized by him in 1922, known as Eastern Corrugated Container Company, holding the offices of president and treasurer and owning fifty-four out of a total of seventy shares of its issued capital stock. At the date of his death, which occurred on May 17, 1925, this stock was the only substantial asset of his estate.

His will contained a positive direction to his testamentary fiduciaries " to liquidate my business as soon after my decease as may be practical." Aside from specific bequests of personal effects to the widow, the entire assets of the estate were erected into a series of trusts. The first was of the entire residue of the estate for the benefit of the widow, to whom payment of " the net income, issue and profits " thereof was directed for life. On her death, secondary trusts in third parts of the corpus are to be established for the benefit of the testator's three children. The provisions of the latter are presently immaterial.

In the estate tax proceeding the value of the fifty-four shares of stock owned by the estate was appraised at $11,977.74. In spite of the mandatory direction in the will for prompt liquidation of the business, the executrix continued its operation. Her action in this regard has not been criticized and is, therefore, not a present issue. During this period it enjoyed a phenomenal, indeed, an almost inexplicable success, earning a net profit according to the figures of the accountant (which are, however, questioned in certain particulars by the special guardian) of upwards of $25,000.

In June of 1936 the executrix applied for permission to sell to herself as an individual the stock holdings of the estate at the price of $15,000, which, as will be observed, was an advance of $3,022.26 over the value of this asset as of the date of death as appraised in the estate tax proceeding. The learned and energetic special guardian appointed by the court to protect the interests of the infants challenged her valuation of the asset and the adequacy of the proposed purchase price, as a result of which a new appraisal was had which fixed the worth of the corporation as of June, 1936, at $67,796.40, giving a proportionate value of $52,300.13 for the fifty-four shares of stock owned by the estate.

As a result of the audit then made, it appeared that the operation of the recently enacted Federal tax on undivided profits would

result in the imposition upon the corporation of taxes on this account of approximately $3,000 in the event that a dividend distribution were not made by the corporation prior to December 31, 1936. Application was accordingly made to this court by the executrix for permission to co-operate in the declaration of such a dividend, and this permission was granted, the order authorizing such action, as resettled, providing that " when the proposed dividend has been declared that said dividend be held as part of the sale price of said 54 shares of Eastern Corrugated Container Co. stock, subject to determination by this court as to whether, if undistributed, it would be income or principal."

Pursuant to this authority and subject to the stated condition, a dividend was declared partly in cash and partly in shares of certain other companies owned by the container company as an investment of surplus and the issue presently submitted for decision concerns the respective rights of income and principal in the dividend so declared.

Subsequent to the declaration of the dividend in the manner and under the conditions described, a contract was executed with the approval of the special guardian and by authority of the court for the purchase by the widow, as an individual, of the fifty-four shares of the container company stock for a total consideration of $32,783. As the court understands the positions of the parties, there is no question but that this sum in its entirety is to be considered principal of the trusts, with the result that their corpus has been increased almost $21,000 over the appraised value of this asset as of the time of death. The only question presently litigated is as to whether all or any part of the surplus earned subsequent to the date of death, removed from the assets of the corporation and segregated in a separate fund, shall be added to principal, or whether it, or any part thereof, is properly distributable to the widow, as life tenant of the trust, on the theory that is is " income " of the trust to which she is entitled under the terms of the will.

It will be obvious from the foregoing recital that the result of the limited authorization of the court for the segregation of the surplus fund is precisely the same as if the so-called " dividend " had not been declared, and the segregated amount had continued in the treasury of the corporation up to the time of sale of the stock with the consequent increase of the purchase price thereof from the actual contract consideration of $32,783 to an aggregate of this sum plus the amount of the " dividend " which is now in the hands of the executrix in *quasi* escrow. The inquiry, therefore, is as to whether a life tenant entitled to income may receive any part of the earnings of an asset of the estate of which she is a beneficiary

which were realized by the estate only on the sale of the asset and which unquestionably enhanced the amount of the price thus received on sale.

It is apparent that such authorities as *Matter of Osborne* (209 N. Y. 450), *Bourne* v. *Bourne* (240 id. 172), and similar cases recently reviewed by this court in *Matter of Olcott* (161 Misc. 890, 897 *et seq.*) have no direct application to the present situation, since they deal solely with dividends actually declared and paid as such. The question here propounded is in certain aspects more accurately comparable with those involved in decisions like *Lawrence* v. *Littlefield* (215 N. Y. 561); *Spencer* v. *Spencer* (219 id. 459); *Furniss* v. *Cruikshank* (230 id. 495), and *Matter of Rowland* (273 id. 100) which deal with the adjustment of the relative equities of life tenant and remainderman in an unproductive asset on its sale, although here, too, the analogy is far from perfect.

In seeking the solution which is most equitable on the facts as disclosed, it will be helpful to recall the rights of life tenant and remaindermen in the ordinary express trust. The classic authority, *Matter of Albertson* (113 N. Y. 434, 439), defines their respective rights in the following words: " the usual purpose of the testator in providing for a beneficial interest in a trust estate is, that the net income shall be applicable only, and that the corpus, or capital, of the trust estate shall remain intact until the trust shall have determined."

Viewing the matter more particularly from the standpoint of the primary *cestui que trust*, " a life estate contemplates a usufruct; a right to enjoy a thing the property of which is in another, and draw from the same all the profit, utility, and advantage which it may produce, provided it be without altering the substance of the thing." (*Matter of Frost*, 184 App. Div. 702, 704; *Matter of Pelcyger*, 157 Misc. 913, 927.)

As this court has had frequent occasion to observe (*Matter of Shupack*, 158 Misc. 873, 877, and cases cited), as to any particular item of property, a testator may make different varieties of gifts. He may give it outright, in its entirety, to one or more persons or he may divide his gift as to any particular item by donating the beneficial use thereof to one individual or set of individuals for a period of time not exceeding the continuance of two lives in being, and give the ultimate possessory enjoyment to still others. Upon the adoption of the latter alternative, it is not only unnecessary but improper, that either gift should be permitted to encroach upon the other. The thing given has, at the date of gift, a certain intrinsic value. This is what is given to the remaindermen with the time of enjoyment postponed until the happening of the conditioning

event. If, in the interval during which the remaindermen are denied possession by the terms of the gift, the intrinsic value of the thing given increases by the operation of natural causes, they will, when their time of enjoyment arrives, receive a thing of greater value than that which the donor himself possessed. If it deteriorates, its worth will be less. All to which the remainderman is entitled in either event is, however, the thing given in the state in which it is at the time when delivery to him was directed, without diminution in value because of the acts or neglects of the person to whom its intermediate use was granted.

An obvious example of the principle involved would be in the gift of a gold ornament to one person for life and to another on the death of the first. The intrinsic value of the article may vary widely between the date of the death of the testator and the time when the ultimate donee receives it; whatever its value, however, it is the particular article itself which is given and received. If in the interval the person accorded temporary possession is able to derive any income therefrom, as by its exhibition, rental or otherwise, that is his, and is no concern of the ultimate donee. The thing given to the primary donee is the use, and any benefits derivable from such use constitute the subject-matter of his gift.

Whereas the example used is perhaps the simplest conceivable, the underlying principles there applicable are equally controlling in all other cases of a divided gift of a single asset. The correct solution in any given case is most readily perceivable when the matter is viewed from the standpoint of the remainderman. He is entitled only to receive the thing originally given at the time appointed for the effectuation of his gift plus such increase in value as may have occurred from natural causes during the period of his postponement. This is the maximum of his valid demand. He may receive less; he cannot be awarded more.

It follows that nothing which is attributable to the use of the thing during the period prior to the effectuation of the gift to the ultimate donee may properly be awarded to the latter. There are few principles more firmly grounded in the law. An accumulation of income, which is merely an alternate expression for " return for use," is not permissible except for the benefit of a minor during minority; anything further is expressly outlawed by statute (Pers. Prop. Law, § 16; Real Prop. Law, § 61), and so rigidly is this rule enforced that the express direction of the particular devolutionary statute contained in section 63 of the Real Property Law will be held inoperative, if its effectuation would result in the circumvention of this basic principle. (*Morris* v. *Morris*, 272 N. Y. 110, 118; *Hawthorne* v. *Smith*, 273 id. 291, 303.)

In the consideration of the problem of the present case it is essential that one important fact be borne in mind. Considering the segregated sum of the " dividend " to be still in the corporate treasury at the moment of the sale of the stock to the widow, the value of the stock owned by the estate was the aggregate of three items or elements, namely, *first*, its worth as appraised as of the date of death, which was $11,977.74; *second*, the surplus profits earned by the corporation between the date of death and December 31, 1936, which, adopting the figures of the widow for illustrative purposes only, amounted to fifty-four seventieths of $25,745.19, or $19,859.15, and, *third*, the natural enhancement in the value of the stock between the date of death and the date of sale, which amounted to $20,805.26. The sum of these three elements gives a total of $52,642.25 as its worth at the time of sale which corresponds approximately with the appraisal of $52,300.13 obtained at the instance of the special guardian.

On primary principles, the corpus of the trust is entitled to retain the first of these three elements, which constituted the original gift of the testator to the remaindermen subject to the life use thereof by the widow. For equally well-established reasons, the principal of the trust is entitled to the sum representing the natural enhancement in value of the original gift, represented by the third figure. (*Pratt* v. *Ladd*, 253 N. Y. 213, 219; *Matter of Hagen*, 262 id. 301, 305; *Matter of Olcott*, 161 Misc. 890, 897.)

The intermediate item, representing the profits or earnings of the original principal during the period subsequent to the date of death, was merely a current return on the use of the original capital.

The benefits derivable from such use during her continued life constituted the subject-matter of the express gift to the widow. To deprive her of it would not only defeat the unequivocal testamentary direction and exclude her from the benefit which is rightfully hers, but its addition to principal, even if permissible under the terms of the will, being in effect an accumulation of income, would be in direct contravention of the statutes inhibiting such action under circumstances such as are here present.

The authorities cited by the learned special guardian concern situations which are materially different from those presently disclosed. In *Matter of Schaefer* (155 Misc. 850) the " profit " claimed by the life tenant was merely an enhancement in value of the principal assets, in other words constituted the third and not the second element of value in the present tabulation. In *Matter of Hagen* (262 N. Y. 301) no realization upon total value had taken place, wherefore analysis and segregation of the several elements of value would have been premature, if not, indeed, impossible.

The dictum on page 305, when read in its context is no more than a reaffirmation of the noted principle that enhancement in value of principal as distinguished from profit from its use, is to be allocated to corpus.

The special guardian, while apparently attaching great significance to the determination in *United States Trust Co.* v. *Heye* (224 N. Y. 242), apparently overlooks its citation with approval of the rule of *Matter of Schaefer* (178 App. Div. 117, 122; affd., 222 N. Y. 533) on page 254 and the following statement: " The fundamental principle involved in these questions is whether there has been a *distribution* or *division* of the earnings, profits or accumulations of the corpora- tion. Until there has been such division, the life tenant is not entitled to any increase in the value of the principal of the trust fund, or the capital and assets of the corporation, shares of which constitute the trust fund. But *when there has been a division of the corporate property, no matter what form it may take, that part thereof which consists of accumulated profits or earnings belongs to the life tenant* and that which is capital to the remainderman." (Last italics not in original.)

A fuller understanding of the significance of this statement is promoted by an examination of *Matter of Schaefer* (178 App. Div. 117; affd., 222 N. Y. 533), the rule of which is thus reaffirmed. In that case, as in the present, the trustees held certain corporate shares, whereas unlike the present case the corporation paid current dividends which went to the life beneficiary, yet, as in the present case certain portions of the current earnings were retained in the corporate treasury with consequent enhancement of the value of its shares. The trustees thereupon sold the stock at such enhanced value and the question of apportionment of the sale price between life tenant and remainderman arose.

The court observes (at p. 121): " The trustees have at least liquidated, that is to say, have turned into money, their interest in the company which was formerly represented by shares of stock. What does this money in their hands represent? Concededly it represents in part accumulated profits earned during the lifetime of the trust, for the stock they sold represented and stood for one-half of the assets of the company, and those assets in part represented accumulated profits. The reason for the rule which requires, in case of a complete liquidation of a corporation, that an apportionment be made between capital and income, seems to me inevitably to require that a like apportionment be made in the present case."

On the succeeding page is given the rule which is cited with approval in the *Heye* case: " Where the trust fund consists of

corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustee in any form or manner the life tenant is entitled to receive them. So far then as the price received by the trustees on the sale of the stock * * * represented accumulated, undistributed profits earned since the creation of the trust, the life tenant is entitled to an apportionment."

To like effect are *Matter of United States Trust Co.* (190 App. Div. 494, 498, 499; affd., 229 N. Y. 598); *Matter of Rogers* (161 id. 108); *Matter of King* (130 Misc. 296, 297); *Matter of Nirdlinger* (290 Penn. St. 457, 478; 139 A. 200). (See, also, *Pratt* v. *Ladd*, 253 N. Y. 213, 219.)

On the facts presented in this case, the same result would be attainable on the theory underlying the decision in *Matter of Steinberg* (153 Misc. 339). This decedent owned fifty-four out of seventy shares of stock of the corporation, in other words over seventy-seven per cent thereof. By reason of this fact, he was in a very real sense in control thereof. His realization of this fact is demonstrated by his testamentary reference thereto as "my business." This control passed to his testamentary fiduciary in consequence of which, she might properly, and could be required to, reflect its operations in her fiduciary accounts. Were this done, the profits realized therein would necessarily be included as *pro tanto* receipts in her trust capacity, the payment of which to those entitled must inevitably be required.

In this opinion no attempt has been made to do more than state the general applicable principles of law since, as the court understands it, some difference of opinion exists between the life tenant and the special guardian as to the exact sum which is attributable to the net profits of the business earned subsequent to the death, as distinguished from accretion to the value of principal. All that is determined, therefore, is that the life tenant is entitled presently to receive the net profits so earned.

In the event that the parties are unable to agree upon a concrete figure the matter may be set down for hearing on usual notice. If, however, agreement is found possible, a decree may be submitted on notice awarding the life tenant such sum.

Proceed in conformity herewith.